# EXHIBIT "1"

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARK DELEON | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. SA-07-CA-0751-FB |
| | § | |
| CITY OF SAN ANTONIO, TEXAS, and | § | |
| DAVID BIERMAN, Individually and in His | § | |
| Official Capacity | § | |

---

**AFFIDAVIT OF OFFICER DAVID BIERMAN IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Before me the undersigned authority on this day personally appeared David Bierman, who, being by me duly sworn, deposed as follows:

"My name is David Bierman. I am over the age of 18 and I have never been convicted of a felony. I am of sound mind and competent to make this affidavit.

It is my testimony I am currently employed by the San Antonio Police Department and have been so employed for approximately 14 years. I am certified by the Texas Commission on Law Enforcement Officer Standards and Education for Texas Peace Officers (TCLEOSE). I have completed a legislatively mandated course of study. The course of study consists of a variety of topic areas to include but not limited to: (1) Arrest, Search, and Seizure; (2) U.S. and Texas Constitutions; (3) Patrol Procedures; (4) Criminal Investigations; (5) Texas Penal Code; (6) Texas Code of Criminal Procedure; (7) Use of Force; (8) Firearms; (9) Physical Fitness; (10) Arrest and Control Strategies; and, (11) Interpersonal Communication/Report Writing.

Upon completion of that course of study, I successfully passed the law enforcement officer licensing examination administered by the Texas Commission on Law Enforcement Officer Standards and Education.

I completed the San Antonio Police Department Academy in 1995 after six months of training. I have also received one week of law enforcement related training in various law enforcement subjects each year I have been on the force since I graduated from the Academy. I am currently assigned to the SAFFE Unit out of the Northside Sub-Station. I have been with the SAFFE Unit for eight years.

On May 9, 2007, I was teamed up with Officer Mark Bishop assigned to patrol the Thousand Oaks and Perrin Bietel area due to a large amount of burglaries. Officer Bishop and I were both wearing SAPD uniforms but we were riding in an unmarked Chevy Impala. Officer Bishop drove the vehicle. We decided to patrol the Northern Hills area due to a report of increased drug dealing and shots being fired.

As we drove down Bellcrest Street we passed a cul-de-sac where two vehicles were illegally parked. The vehicles were parked in the middle of the street, head on to the curb instead of parallel to the curb. I saw four people by the vehicles. I advised Officer Bishop of what I had seen and he made a U-turn to go back to the cul-de-sac.

As we approached the vehicles I noticed one was a red extended-cab truck and the other was an Impala. Officer Bishop parked our vehicle behind the Impala. There were two males outside of the truck on the passenger side and two males outside of the Impala on the driver's side.

I exited the vehicle and turned my flashlight on, and told the four people to, "Let me see your hands, put them on the car." They looked directly at me and placed their hands on the

vehicles nearest to them. I watched the two individuals near the truck while Officer Bishop watched the two near the Impala. As I watched the two by the truck, a male individual got out of the truck from the driver's door. I was startled because I had not seen anyone in the truck. This individual repeated my commands to his friends. I told him, "No, you place your hands on the truck." The individual finally complied.

At this point, another male individual exited out of the rear passenger seat of the Impala. This also startled me. This second individual looked at me and jumped back into the car. At this time I was in fear for my safety as well as the safety of Officer Bishop. I feared that this individual was going back into the vehicle for a gun. I held my flashlight in one hand and I drew my service weapon with my right hand. I told him to get out of the car and to let me see his hands. He exited from the back of the Impala while holding something in his hands. I pointed my weapon at him and he dropped a CD case and something else that he was holding. He then placed his hands on the trunk area of the Impala.

I saw movement coming from the passenger side of the truck. I saw one of the males by the truck take something out of the cab of the truck. The door was closed but the window was down. This individual had first been where the bed and the back door of the truck meet. As he pulled his hand out of the cab, I saw something shiny and metallic looking in his right hand. My first thought was that it was a chrome-plated pistol. I had my flashlight and my weapon pointed at this individual. The light from my flashlight was reflecting off the shiny object in his hand. There was also a working streetlight about thirty to forty-five feet away. Because I believed the individual had a pistol, I believed that Officer Bishop and I were in danger of being shot by this individual.

I yelled at this individual, "Let's see hands, come here. Stop!" The individual hurriedly

walked away from me.  I was about eighteen feet behind and to the left of him.  He was hurriedly walking with his right hand down by his side, and I could see what I believed to be the butt of a pistol in his right hand.  I heard him say, "Fuck this shit!"  As the individual said this, he abruptly turned to his left toward me.  As he turned, the individual raised his right hand, with the shiny object in his hand, up parallel to the ground.  I believed that he was going to turn and shoot me.  I fired my weapon one time at him before he could turn all the way around.  The shiny object in his hands flew ten to twelve feet to his right.  It seemed to me that it was a heavy object.

The individual fell to the ground.  I ran up and placed handcuffs on him.  I shined my flashlight on the object that he had been carrying and noticed that the shiny object turned out to be a clear plastic bag containing marijuana.

I got on the radio and told the dispatcher that I needed more officers and EMS.  I stayed with the male who had been shot and Officer Bishop dealt with the others.

Further affiant sayeth naught."

DAVID BIERMAN

SWORN TO AND SUBSCRIBED before me on this the ___ day of June, 2009.

NOTARY PUBLIC in and for the
STATE OF TEXAS



# EXHIBIT "2"

Mark DeLeon

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
MARK DELEON,                    )
                                )
          Plaintiff             )
                                )
VS.                             )     CIVIL ACTION NO.
                                )     SA-07-CA-0751-FB
CITY OF SAN ANTONIO, TEXAS,     )
and DAVID BIERMAN,              )
Individually and in His         )
Official Capacity,              )
                                )
          Defendants            )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

MARK DeLEON

APRIL 1, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of MARK DeLEON, produced as a

witness at the instance of the Defendant David Bierman, and

duly sworn, was taken in the above-styled and numbered cause

on the 1st day of April, 2009, from 9:32 a.m. to 11:38 a.m.,

before Stephanie Clark, CSR in and for the State of Texas,

reported by machine shorthand, at the Law Offices of Gale,

Wilson & Sanchez, PLLC, 115 East Travis, 19th Floor, San

Antonio, Texas 78205, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

da16e996-ef0d-42b9-bbec-cec79ae020e0

Mark DeLeon

Page 42

1    Bellcrest?

2        A.   No.   I just -- from what I recall, that's the first

3    time I seen the car driving by, which was going this way.

4    (Indicates.)

5        Q.   Okay.  And when you say it was going "this way,"

6    there's --

7        A.   Going this way.  (Draws on diagram.)

8        Q.   Okay.  So that would be west; is that right?

9        A.   Yeah.

10       Q.   Okay.

11       A.   Yeah.  You know, it depends on where you're

12   standing at.

13       Q.   So the officers pulled up with the headlights on.

14   Were the -- do you know whether the dim -- whether it was on

15   low beam or high beam?

16       A.   I don't think that the brights were on, but -- I

17   mean, it was regular headlights from what I can recall.  I

18   don't remember if it was brights or not.

19       Q.   And after the officers pulled up, they got out of

20   the car, right?

21       A.   Uh-huh.

22       Q.   Yes?

23       A.   Yes.

24       Q.   And you recognized immediately that they were

25   police officers, right?

Mark DeLeon

Page 43

1      A.   Well, they jumped out the car with their guns

2  drawn, said, "Nobody move.  Put your hands on the truck."

3           MR. RALLS:  I just need to make an objection

4  as to nonresponsive.

5      Q.   (BY MR. RALLS)  But my question really was:  As

6  soon as they got out of the car, you knew they were police

7  officers, right?

8      A.   After what they said, yes.

9      Q.   You couldn't see their uniforms?

10      A.   No.

11      Q.   How far -- well, actually, that's probably going to

12  be -- could be determined from that drawing, I think.  But

13  what's your best recollection of the distance between where

14  you were and where the officers pulled up?

15      A.   I couldn't tell you exactly.  From where I was

16  standing, maybe a little bit further than that wall, maybe.

17  (Indicates.)

18      Q.   What would you estimate that to be?

19      A.   The distance?  About 15 yards.

20      Q.   15 feet maybe?  Or 15 yards?  A yard is three feet.

21      A.   Yes, I know.  I'd say about ten to fifteen yards.

22      Q.   All right.  And your recollection is that when they

23  both -- well, go ahead and tell us now what happened when

24  they got out of the car.

25      A.   You know, when they pulled up, you know, before

da16e996-ef0d-42b9-bbec-cec79ae020e0

Mark DeLeon

Page 44

1    they got out the car, we still didn't know who it was until,

2    you know, they -- we just saw two people get out -- two

3    people got out, yelled, said, "No one move.  Put your hands

4    on the truck" or on the car, and that's what I did.  I had

5    the bag still in my hand because, I mean, that's what I -- I

6    was about to roll it.  And that's what I did.

7        Q.   Okay.  And when they yelled that, at that point you

8    understood they were police officers?

9        A.   Yeah.

10       Q.   And when you -- you had the bag in your hand and

11   you put your hand on the truck, were you in the same

12   position that you were in where you've drawn the red dot --

13       A.   Yes.

14       Q.   -- on Exhibit 2?

15       A.   Yes.

16       Q.   So back by the right rear wheel?

17       A.   Yes, sir.

18       Q.   And what happened after that?

19       A.   Arron and his brother over here -- I don't know --

20   they were doing something that had both the officers focus

21   their attention on them.  And I knew I had the traffic

22   warrants and I knew I had the marijuana on me, so I

23   decided -- I thought I could -- I thought I could run and

24   get away with it.

25       Q.   Do you know what Arron and his brother -- and I

Mark DeLeon

Page 45

1    guess you're referring to Dominic, right?

2         A.   Yes, sir.

3         Q.   Do you know what Eric [sic] and Dominic were doing

4    that required the officers to focus on them?

5         A.   Well, the officers yelled, "Stop.  Stop fucking

6    moving," so . . .

7         Q.   Do you know -- well, first of all, did you hear the

8    officers yell anything else before you started to run?

9         A.   Other than telling them, you know, to stop moving,

10   no.

11        Q.   Did you see either Eric or Dominic get back into

12   the Impala for any length of time before the officers told

13   them to stop moving?

14        A.   No.

15        Q.   And you're certain that when the officers got out

16   of the car, that both of them already had their weapons

17   drawn?

18        A.   Yes.

19        Q.   Can you -- first of all, take that red pen, again,

20   and can you label or just put your initials by the dot that

21   you've drawn on Exhibit 2 to show that that's you.

22        A.   Okay.

23        Q.   And can you indicate on there with this blue pen,

24   where the two officers were when they were focusing on Arron

25   and Dominic?

Gulfstream Court Reporting

Mark DeLeon

Page 46

1      A.   I mean, it all happened so fast.  I believe, you

2   know, both cops were still on both sides of the vehicle,

3   right where they had gotten out, with their doors open.

4      Q.   Okay.  Why don't you go ahead and label "PO" for

5   the officers.

6      A.   (Complies.)

7      Q.   And had they -- had the officers moved from those

8   positions at the time that you started running?

9      A.   Couldn't really tell.  You know, I knew that they

10  both focused their attention on them because they were all

11  moving around.  And, you know, it -- I mean, it was just

12  like that, you know.  As soon as they tell -- as soon as

13  they looked at them, you know, told them to stop moving, I

14  ran.

15     Q.   And how long was it after the officers arrived at

16  the scene and got out of their cars that they -- that Arron

17  and Dominic started moving and requiring the officers to

18  focus on them?

19     A.   Probably immediately.

20     Q.   So immediately after they got there, that happened,

21  and immediately after that happened, you started to run?

22     A.   Yes.

23     Q.   So, and your recollection is that the officers were

24  both next to their car at that point in time?

25     A.   Yeah.  I couldn't really see because, like, the

Mark DeLeon

Page 47

1    headlights were on and, I mean, I was worried about what I

2    was about to do, you know.

3        Q.    Did either of the officers have a flashlight out?

4        A.    I couldn't tell you that, no.

5        Q.    Just don't know one way or the other?

6        A.    No.

7        Q.    And you knew -- I mean, when the officers got out,

8    they told you to put your hands on the vehicles, right?

9        A.    "Nobody move.  Put your fucking hands on the

10   truck."

11       Q.    Okay.  And that's what you did?

12       A.    Yes.

13       Q.    Because you understood that --

14       A.    Well, I knew by the way they were talking that they

15   were cops.

16       Q.    Yeah.  And you understood that you needed to follow

17   the cops' orders, right?

18       A.    Yes.

19       Q.    And that's why you did that?

20       A.    Yes.

21       Q.    And then you became afraid of what was going to

22   happen if you got arrested and decided that you would quit

23   following the officers' orders and make a run for it?

24       A.    Yes.

25            MR. GALE:  Objection; argumentative.  The part

Mark DeLeon

Page 48

1    of (inaudible) put your hands on the truck.

2                    THE REPORTER:  I'm sorry, Mr. Gale?

3                    MR. GALE:  Objecting, it's argumentative.

4    Don't worry about the rest.

5          Q.    (BY MR. RALLS)  All right.  The only orders that

6    you understood that you had been given were to put your

7    hands on the truck?

8          A.    Yes.

9          Q.    And I mean, you understood that as the officers

10   meaning for you, Mark DeLeon, among the other people there

11   to put your hands on the truck?

12         A.    Yes.

13         Q.    And you understood that the officers meant for you

14   to keep your hands on the truck?

15         A.    Yes.

16         Q.    And you understood that the officers meant for

17   you -- did not mean for you to take off running?

18         A.    Yes.

19         Q.    And you understood when you took off running, that

20   you were not doing what you believed the officers wanted you

21   to do?

22         A.    Yes.

23         Q.    When you took off running, you had the bag of

24   marijuana in your right hand; is that right?

25         A.    Yes.

Mark DeLeon

Page 51

1    wasn't just a straight dash.  I had to run, you know, on a

2    diagonal.

3         Q.   Okay.  And where were you running to?

4         A.   Tell the truth, I -- I don't know.  I was just

5    running.  I -- I got a couple steps before I got shot.

6         Q.   Yeah.  You just weren't thinking clearly?

7         A.   Huh-uh.  I just didn't want to get in trouble.

8         Q.   All right.  But you didn't know where you were

9    going to?

10        A.   I was probably going to try to jump some fences.

11        Q.   You weren't trying to go into the house; you were

12   just going to try and make a getaway running?

13        A.   Yeah.

14        Q.   That's correct?

15        A.   Yes, sir.

16        Q.   And you were going to do that knowing that there

17   were two officers that you believe both had their weapons

18   drawn who had ordered you previously to stay there with your

19   hands on the truck?

20        A.   Yes.

21        Q.   Did you -- okay.  You don't remember saying

22   anything before you were shot?

23        A.   No.

24        Q.   And you don't remember hearing the officers or

25   either of the officers say anything before you were shot?

da16e996-ef0d-42b9-bbec-cec79ae020e0

Mark DeLeon

Page 52

1        A.    No.

2        Q.    Where were you shot?

3        A.    In the arm.  Through my arm and out my shoulder.

4        Q.    Do you know -- do you know whether the entrance

5    wound was in the right or -- I'm sorry -- in the back or in

6    the front of your arm?

7        A.    It was in the back.

8        Q.    How do you know that?

9        A.    Because I was running.  I had my back, I -- towards

10   him and that's it.  Next thing I know, I'm on the floor with

11   my shirt all wet.  He's running up to me, still with the gun

12   pointed at me.  He said, "Fuck," and he handcuffed me.

13              And I told him, "Why are you handcuffing me?

14   Where the fuck do you think I'm going?"  You know, and I was

15   just in shock that he shot me.  And I just kept yelling at

16   him.  "You fucking shot me.  Why the fuck did you shoot me?"

17   You know, that's it.

18       Q.    Okay.  And you didn't say anything to him

19   whatsoever before he shot?

20       A.    No.

21       Q.    And didn't -- did you ever turn toward the officer

22   before he shot?

23       A.    No.

24       Q.    Do you know when the officer -- when

25   Officer Bierman came up to you to handcuff you, did he have

da16e996-ef0d-42b9-bbec-cec79ae020e0

Mark DeLeon

Page 53

1    his flashlight then?

2        A.   I don't remember a flashlight, no.  I just know he

3    was pointing the gun at me.

4        Q.   And did he handcuff both your hands?

5        A.   Yeah.  He handcuffed both my arms behind my back.

6    You know, he told me to stop fucking moving because I was,

7    you know, squirming around, you know.  I just got shot and

8    didn't know -- didn't have no idea that was about to happen.

9              I thought maybe a chase, at the most, was

10   going to ensue, you know.  If he would have told me, "Stop

11   or I'm going to shoot," I would have dropped and I would

12   have stopped.  I had no idea that was going to happen.

13             MR. RALLS:  Okay.  Objection; nonresponsive.

14       Q.   (BY MR. RALLS)  Is the reason that you believe that

15   you were shot in the back of the arm because -- simply

16   because you had your back to Officer Bierman?

17       A.   I was running away from him, yes.

18       Q.   Okay.  But I mean, you can't tell us that you

19   actually felt the bullet go in through the back of your arm

20   and come out the front?

21       A.   Well, no.  I mean, it's just something that

22   happened.

23       Q.   Yeah.

24       A.   I just dropped.

25       Q.   And it's your testimony that you never made any

Gulfstream Court Reporting

Tel: (210) 490-6444                    Fax: (210) 579-6507

da16e996-ef0d-42b9-bbec-cec79ae020e0

Mark DeLeon

Page 54

1    movement or any attempt to stop and turn back around toward

2    Officer Bierman?

3        A.   Huh-uh, no.

4        Q.   Did you ever raise your right hand as you were

5    running, that you recall?

6        A.   No.

7        Q.   But you had the baggy of marijuana in your right

8    hand?

9        A.   Yes.

10       Q.   Okay.

11            (Exhibit No. 3 referenced.)

12       Q.   (BY MR. RALLS)  All right.  Let me hand you what

13   I've marked as Deposition Exhibit No. 3.  And do you

14   recognize the bag of marijuana depicted in that photograph

15   to be the bag of marijuana that you had with you that night?

16       A.   Yes, sir.

17       Q.   And that's an accurate representation of the bag of

18   marijuana as it existed that night?

19       A.   Yeah.

20       Q.   And it's -- next to it is a little placard with a 4

21   on it.

22       A.   Yeah.

23       Q.   And then on the -- what we've marked as Deposition

24   Exhibit No. 2 is a legend showing that No. 4 is a "large

25   baggie" and showing the location in the area of where the

Mark DeLeon

Page 55

1    baggy was found.

2                Does that appear to you to be about correct?

3        A.   Yes.

4        Q.   How far --

5                MR. RALLS:  Well, strike that.

6        Q.   (BY MR. RALLS)  When you realized that you had been

7    shot, do you have any recollection of what you did with the

8    bag of marijuana?

9        A.   I mean, I just fell to the floor, you know.  I fell

10   to the floor and I believe I fell, you know, flat on the

11   front of my body.  And, you know, I rolled over.  You know,

12   grabbed my shoulder, you know.  I -- I don't know what the

13   bag -- I -- I don't -- it's, you know, just quick blank.

14   You know, just a flash, you know.  It's just a flash.  I

15   don't know.  I mean, I don't know what happened.

16       Q.   Okay.  So the short answer is you don't know what

17   you did with the --

18       A.   No.  I'm sorry.

19       Q.   That's all right.  That's correct, though, you

20   don't know what you did?

21       A.   Correct.

22                (Exhibit No. 4 referenced.)

23       Q.   (BY MR. RALLS)  Let me hand you what I've marked as

24   Deposition Exhibit No. 4, and ask you if you can identify

25   that knife that's indicated in that or that's shown in that

Page 97

```
1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION
3    MARK DELEON,                    )
                                     )
4         Plaintiff                  )
                                     )
5    VS.                             )    CIVIL ACTION NO.
                                     )    SA-07-CA-0751-FB
6    CITY OF SAN ANTONIO, TEXAS,     )
     and DAVID BIERMAN,              )
7    Individually and in His         )
     Official Capacity,              )
8                                    )
          Defendants                 )
9
                    REPORTER'S CERTIFICATE
10               DEPOSITION OF MARK DeLEON
                      APRIL 1, 2009
11
12        I, Stephanie Clark, Certified Shorthand Reporter in
13   and for the State of Texas, hereby certify to the following:
14        That the foregoing deposition transcript of
15   MARK DeLEON, the witness, was duly sworn by the officer and
16   that the transcript of the oral deposition is a true record
17   of the testimony given by the witness;
18        That the charge for the completed deposition is
19   $598.55  due from Defendant David Bierman;
20        That the deposition transcript was submitted on
21   April 15   , 2009, to MR. CHRISTOPHER J. GALE for
22   examination, signature, and return to me by
23   May 7   , 2009.
24        That the amount of time used by each party at the
25   deposition is as follows:
```

Mark DeLeon

Page 98

1          MR. CHRISTOPHER J. GALE - 0:00

           MR. N. MARK RALLS - 1:51

2          MS. DEBORAH LYNNE KLEIN -  0:06

3          That pursuant to information given to the

4    deposition officer at the time said testimony was taken, the

5    following includes counsel for all parties of record:

6          Mr. Christopher J. Gale, Attorney for Plaintiff;

           Mr. N. Mark Ralls, Attorney for Defendant

7            David Bierman;

           Ms. Deborah Lynne Klein, Attorney for Defendant

8            City of San Antonio, Texas.

9          I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties in the action

11   in which this proceeding was taken, and further that I am

12   not financially or otherwise interested in the outcome of

13   the action.

14         Certified by me this *13* day of *April* , 2009.

15

16            *Stephanie Clark*

17          _____

           STEPHANIE CLARK, RPR, Texas CSR

18         Expiration Date:  12-31-09

           Gulfstream Court Reporting, LLC

19         Firm Registration No. 245

           16607 Blanco Road, Suite 1307

20         San Antonio, TX 78232

           512.439.0863 - 210.490.6444

21

22

23

24

25

Gulfstream Court Reporting

Tel: (210) 490-6444           Fax: (210) 579-6507

# EXHIBIT
# "3"



# EXHIBIT
# "4"

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARK DELEON | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. SA-07-CA-0751-FB |
| | § | |
| CITY OF SAN ANTONIO, TEXAS, and | § | |
| DAVID BIERMAN, Individually and in His | § | |
| Official Capacity | § | |

---

**AFFIDAVIT OF VINCENT J. M. DI MAIO, M.D.
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority in and for the State of Texas, on this day personally appeared Vincent J. M. DiMaio, M.D., personally known to me, who after having first been duly sworn, upon his oath deposed and testified as follows:

"My name is Vincent J. M. DiMaio, M.D.  I am over 18 years old, of sound mind, and I am competent to testify to the matters herein.  I am a physician, Board Certified in Anatomical, Clinical, and Forensic Pathology.  My qualifications are set forth in my Curriculum Vitae, a true and correct copy of which is attached to this Affidavit and incorporated herein for any and all purposes as though set forth verbatim as Exhibit "A."  All of my conclusions, opinions, and observations provided in this matter are true and correct, and based upon my years of medical experience and education and case documents that I have personally reviewed in this matter.

In arriving at all my conclusions, opinions, and observations in this matter, I reviewed the following materials:

1.      The deposition of Mark DeLeon;

2.      The deposition of Officer David Bierman;

3.      Medical records from Brooke Army Medical Center;

4.      Medical records from University Hospital;

5.      The EMS records;

6.      The San Antonio Police Department Internal Affairs File;

7.      The audio statement;

8.      Photographs of Mr. Deleon's injuries;

9.      Interrogatories;

10.     The white t-shirt and green polo shirt worn by Mr. Deleon when he was shot;

11.     X-rays taken at Brooke Army Medical Center; and,

12.     The deposition of Robert A. DeLorenzo.

Based upon the aforementioned materials, I have concluded that the following is an accurate recitation of the facts and events surrounding the matter herein.

At approximately 2345 hrs on May 8, 2007, Officers David Bierman and Mark Bishop, wearing regulation SAPD uniforms, were riding in an unmarked city vehicle. As they turned off Bell Drive onto Bellcrest, they observed a number of individuals in and around two illegally parked vehicles. The Officers drove up to the vehicles, stopped, got out, and told the individuals to place their hands on the vehicles. One of the individuals, subsequently identified as Mark DeLeon, reached into one of the vehicles, grabbed something shiny with his right hand, and began to walk away. Officer Bierman, fearing that Mr. DeLeon may have picked up a weapon, ordered him to stop and show his hands. Mr. DeLeon stopped and turned towards the Officer raising his right hand level with the ground. At this time, Officer Bierman seeing something

shiny in Mr. DeLeon's hand and thinking it a gun, fired one shot from his .40 S&W caliber Glock Model 22. The bullet struck Mr. DeLeon in his left shoulder, at which time he fell to the ground. The shiny object in Mr. DeLeon's hand turned out to be a plastic bag of marijuana. The SAPD dispatcher was notified and EMS requested.

At approximately 2349 hrs on May 8, 2007, the SAFD-EMS received a call of a shooting. They arrived at the scene at 2359 hrs where they made contact with Mr. DeLeon. Mr. DeLeon was oriented and conversant with a blood pressure of 138/91 mm, a pulse of 94/m and a respiratory rate of 24/m. He was noted to have a perforating wound of the left shoulder. EMS departed the scene at 0008 hrs arriving at Brooke Army Medical Center at 0024 hrs.

At Brooke Army Medical Center, Mr. DeLeon was found to have a perforating gunshot wound of the left shoulder with the entrance to the front of the shoulder and an exit to the back. X-rays of the left shoulder revealed a non displaced transverse fracture of the left scapular spine and a comminuted fracture of the proximal humerus, extending through the neck, with minimum displacement. Multiple metal fragments overlay the fracture site.

Subsequent examination by myself on Wednesday, April 22, 2009, of the clothing Mr. DeLeon was wearing revealed a defect of the left front shoulder region of the green polo shirt approximately 5-6 mm in size with a defect of the back of the polo shirt twice the size of the front defect. Flecks of dried out white tissue were on the inner surface of the defect in the back of the shirt. Examination of the white tee shirt revealed a small defect of the front approximately 4.5-5 mm with an elongated defect on the back of the shirt measuring approximately 12x6 mm.

Examination of the photographs of Mr. DeLeon's wounds reveal a punched out gunshot wound of the front of the left shoulder with micro-tears of the margin. Present on the back of the

left upper arm, was a bullet wound two to three times the dimensions of the front wound with beveling of the lower margin. There was no abrasion ring nor micro tears.

Examination of the x-rays of the left shoulder reveal approximately 5 small, dense particles, consistent with lead bullet fragments, adjacent to the exit wound of the back of the shoulder, below the level of the femoral head.

Based on the appearance of the gunshot wounds in the photographs, the x-rays and the examination of the clothing, it is my opinion that, in all medical probability, the bullet entered the front of the left shoulder and exited the back of the left upper arm. Bullet entrance wounds may appear as either round to oval wounds with abraded margins or punched out defects in the skin with or without micro-tears. The latter appearance with or without micro-tears is most commonly seen in association with jacketed or semi jacketed bullets such as was used in this case. The white flecks seen on the polo shirt are fragments of tissue ejected out the exit wound at the time the bullet exited.

I reserve the right to amend this report should additional information be presented for my review.

Further affiant sayeth naught."

VINCENT J.M. DI MAIO, M.D.

SUBSCRIBED TO AND SWORN before me on this the 24th day of June 2009.

NOTARY PUBLIC in and for the
STATE OF TEXAS

CHRIS FINGER
Notary Public
STATE OF TEXAS
My Comm. Exp. 11-24-2012

# EXHIBIT

## "5"

# CURRICULUM VITAE

NAME:                          Vincent J.M. Di Maio, M.D.

ADDRESS:                       10 Carriage Hills
                               San Antonio, Texas 78257
                               (210) 698-1400
                               vincent_dimaio@yahoo.com

BIRTHDATE:                     March 22, 1941

BIRTHPLACE:                    Brooklyn, New York

COLLEGE:                       St. John's University, 1958-1961

MEDICAL SCHOOL                 State University of New York
                               Downstate Medical Center, 1961-1965

## POSTGRADUATE TRAINING

Internship in Pathology:       Duke University Hospital, Durham, NC
                               July 1, 1965 - June 30, 1966

Residency in Pathology:        State University - Kings County
                               Medical Center, Brooklyn, NY
                               June 1, 1966 - June 30, 1969

Fellow in Forensic Pathology:  Office of the Chief Medical Examiner
                               of Maryland, Baltimore, Maryland,
                               July 1, 1969 - June 30, 1970

## BOARD CERTIFICATION

American Board of Pathology, ANATOMICAL PATHOLOGY, 1970

American Board of Pathology, CLINICAL PATHOLOGY, 1970

American Board of Pathology, FORENSIC PATHOLOGY, 1971

## MILITARY SERVICE

Major, Medical Corps, United States Army Reserve, July 1, 1970 -
June 30, 1972.  Assigned to Armed Forces Institute of Pathology,
Washington, D.C.

## PRESENT POSITIONS

| | |
|---|---|
| Consultant in Forensic Medicine And Pathology | March 1, 1981 - present |
| Editor-In-Chief | American Journal of Forensic Medicine and Pathology, January 1, 1992, to present |
| Consultant | Bexar County Medical Examiner's Office, 1/01/07 to present |
| Member | Strategic Planning Committee of National Association of Medical Examiners, 2003 to present |
| Member | Working group to develop standards/guidelines for medical examiners, Standards, Inspections and Accreditation committee of the National Association of Medical Examiners |
| Board of Directors | National Association of Medical Examiners, 2004 to present |

## PRIOR POSITIONS

| | |
|---|---|
| Chief Medical Examiner | Bexar County, San Antonio, Texas March 1, 1981, to December 31, 2006 (retired) |
| Professor | Department of Pathology, University of Texas Health Science Center at San Antonio, February 1, 1987, to December 31, 2006 |
| Consultant | Saville Inquiry into "Bloody Sunday", 2003-2004 |
| Member | Strategic Planning Committee of National Association of Medical Examiners, 1999 to 2001 |
| Consultant | Assassination Records Review Board, Washington D.C. |
| Consultant | United Nations Office of the Prosecutor for the International Criminal Tribunal for the Former Yugoslavia (September 1997 - February 1998) |
| Director | Bexar County Criminal Investigation Laboratory San Antonio, Texas March 1, 1981 - April 15, 1997 |
| Medical Examiner | Office of the Dallas County Medical Examiner, Dallas, TX, July 1, 1972 - February 28, 1981 |

| | |
|---|---|
| Associate Professor | Dept. of Pathology, University of Texas Health Science Center at Dallas, September 1, 1977 - February 28, 1981 |
| Assistant Professor | Dept. of Pathology, University of Texas Health Science Center at Dallas, September 1, 1974 - August 31, 1977 |
| Instructor | Dept. of Pathology, University of Texas Health Science Center at Dallas, July 1, 1972 - August 31, 1974 |
| Chief, Wound Ballistics Section | Forensic Pathology Branch, Armed Forces Institute of Pathology, July 1, 1971 - June 30, 1972 |
| Chief, Legal Medicine Section | Forensic Pathology Branch, Armed Forces Institute of Pathology, Sept. 1, 1970 - June 30, 1971 |

**PROFESSIONAL OFFICES**

| | |
|---|---|
| Board of Editors | American Journal of Forensic Medicine and Pathology, February 1980 - |
| Board of Editors | Legal Medicine (Japanese Soc. of Legal Med), 1999- |

**PRIOR PROFESSIONAL OFFICES**

| | |
|---|---|
| Board of Editors | Journal of Forensic Sciences, February 1980 - 2000 |
| Board of Directors | National Association of Medical Examiners, 1980 - 1986 |
| Chairman | Council on Forensic Pathology, American Society of Clinical Pathologists, 1979 - 1982 |
| Member | Council on Forensic Pathology, American Society of Clinical Pathologists, 1976 - 1982 |
| Editor | Forensic Science Gazette, Sept. 1, 1974 December 31, 1980 |
| Editorial Board | Pathologist, College of American Pathologists, 1980 - 1983 |
| Consultant | Department of Pathology, Baylor University |

Medical Center, Dallas, Texas,
July, 1980 - February, 1981

## PROFESSIONAL MEMBERSHIPS

Fellow, American Academy of Forensic Sciences

National Association of Medical Examiners (1971 - present)

Membro academico correspondiente Academia de Medicinia legal y ciencias forenses de la Republica Argentina

## AWARDS

"The CCE Commissioners' Medal" by The American Society
of Clinical Pathologists

The "Jean R. Oliver, M.D. Master Teacher Award",
presented by the Alumni Association of the State
University of New York-Downstate Medical Center.
Brooklyn, New York, May 12, 1990

"The George E. Gantner Jr., Memorial Award"
presented by the National Association of Medical
Examiners, Baltimore, MD, September 16, 1997

"Outstanding Service Award"
presented by the National Association of
Medical Examiners, Minneapolis, Minn.
October 19, 1999

"Milton Helpern Award"
Presented by the Pathology/Biology Section
American Academy of Forensic Sciences
Chicago Illinois, February 19, 2003

Milton Helpern Laureate Award
Presented by the National Association of
Medical Examiners, October 17, 2006

## BOOKS

1. Di Maio T.G. and Di Maio V.J.M. **Excited Delirium Syndrome**. CRC Press Inc. Boca Raton,Fl, 2006

2. Di Maio, V.J.M. and Di Maio, D. **Forensic Pathology**. 2nd ed. CRC Press Inc., Boca Raton, FL, 2001
(Di Maio, V.J.M. and Di Maio, D. Medycyna sądowa  Urban & Partner 2005.

3. Di Maio, V.J.M.  **Gunshot Wounds** - Practical Aspects of Firearms, Ballistics and Forensic
Techniques. 2nd ed. CRC Press Inc., Boca Raton, FL, 1999.

   *(Di Maio, V.J.M. Hewridas Por Arma de
   Fuego – Aspectos practicos sobre las armas de fuego, balistica y tecnicas forenses. Ediciones La
   Rocca, Buenos Aires, 1999)*

   *(Di Maio, V.J.M. Blessares Par Armes a Feu - Aspects pratiques des armes a feu, de la balistique et
   des techniques medico-legales. Masson, Paris, 1991 (pour la traduction francaise))*

4. Di Maio, V.J.M. and Dana, S.E. **Handbook of Forensic Pathology**.   2nd ed. CRC Press Inc., Boca
Raton, FL, 2006

   *(Di Maio, V.J.M. and Dana, S.E. Manual de Patologia Forense. EdicionesDiaz de Santos,S.A.
   Madrid, Espana, 2003)*

5. Di Maio, V.J.M. (Editor)  Symposium on Forensic Pathology - Clinics in Laboratory Medicine.  Vol.
3, No. 2, June 1983, W.B. Saunders Co., Phil, PA.

## ARTICLES

1. DiMaio, D.J., Zeichner, M., DiMaio, V.J.M.  "Sudden Death in a Woman with Unsuspected
Idiopathy Pulmonary Hemosiderosis", JAMA, 206:2520-2522, 1968.

2. Minkowitz, S., Zeichner, M., DiMaio, V.J.M. "Cystosarcoma Phyllodes:  A Unique Case with
Multiple Unilateral Lesions and Ipsilateral Axillary Metastasis",  J. Path. Bact., 96:514-517,
1968.

3. DiMaio, V.J.M., Spitz, W.U.  "Injury by Birdshot", J. Forensic Sci., 15:396-402, 1970.

4. Spitz, W.U., Sopher, I.M., DiMaio, V.J.M.  "Medicolegal Investigation of a Bomb Explosion in
an Automobile", J. Forensic Sci., 15:537-552, 1970.

5. DiMaio, V.J.M., DiMaio, D.J.  "A Postpartum Dissecting Coronary Aneurysm", NY State J.
Med., 71:767-769, 1971.

6. DiMaio, V.J.M., Spitz, W.U.  "Variations in Wounding due to Unusual Firearms and Recently
Available Ammunition", J. Forensic Sci., 17:377-386, 1972.

7. DiMaio, V.J.M., DiMaio, D.J.  "Bullet Emboli:  Six Cases and a Review of the Literature", J.
Forensic Sci., 17:394-398, 1972.

8. DiMaio, V.J.M., DiMaio, D.J.  "An Unsuspected Stab Wound of the Brain", Military Med.,
137:434-435, 1972.

9. DiMaio, V.J.M. "Wound Ballistics", J. Assoc. Firearms/Toolmark Examiners, 4:27-29, 1972.

10.    DiMaio, V.J.M., Jones, J.A., Petty, C.S.   "Ammunition for Police: A Comparison of the Wounding Effects of Commercially Available Cartridges", J. Police Sci. Adminis., 1:269-273, 1973.

11.    DiMaio, V.J.M., Mullick, F.G., Henry, L.D.   "Hexachlorophene Poisoning"   J. Forensic Sci., 18:303-308, 1973.

12.    DiMaio, V.J.M.   "Accidental Hangings due to Pacifiers", JAMA, 226:790, 1973.

13.    Sturner, W.Q., DiMaio, V.J.M.   "Fatal Hyperglycemia and Acidosis Following Pancake Syrup Ingestion", AACTion (Newsletter of the Amer. Acad. Clin. Toxicol.), 1:3-5, 1973.

14.    DiMaio, V.J.M.   "From Dallas to Chappaquiddick:  A Tale of Failure", J. Canad. Soc. Forensic Sci., 7:127-128, 1974.

15.    Henry, L.D., DiMaio, V.J.M.   "A Fatal Case of Hexachlorophene Poisoning", Military Med., 139:41-42, 1974.

16.    DiMaio, D.J., DiMaio, V.J.M.   "Two Deaths Caused by a Lack of Oxygen in a Water Vault", J. Forensic Sci., 19:398-401, 1974.

17.    DiMaio, V.J.M., Garriott, J.C.   "Lethal Caffeine Poisoning in a Child", Forensic Sci., 3:275-278, 1974.

18.    DiMaio, V.J.M., Henry, L.D.   "Chloroquine Poisoning", Southern Med. J., 67:1031-1035, 1974.

19.    DiMaio, V.J.M., Berstein, C.G.   "A Case of Infanticide", J. Forensic Sci., 19:744-754, 1974.

20.    DiMaio, V.J.M., Jones, J.A.   "Deaths due to Accidental Discharge of a Dropped Handgun", J. Forensic Sci., 19:759-767, 1974.

21.    DiMaio, V.J.M., Jones, J.A., Caruth, W.W., et.al.   "A Comparison of the Wounding Effects of Commercially Available Handgun Ammunition Suitable for Police Use", FBI Law Enforcement Bull., 43:3-8, 1974.

22.    DiMaio, V.J.M., Garriott, J.C.   "A Fatal Dose of Paraldehyde During Treatment of a Case of Delirium Tremens", J. Forensic Sci., 19:755-758, 1974.

23.    DiMaio, V.J.M., Minette, L.J., Johnson, S.   "Three Deaths due to Revolver Shot Shell Cartridges", Forensic Sci., 4:247-252, 1974.

24.    DiMaio, V.J.M., Garriott, J.C., Putman, R.   "Digoxin Concentration in Postmortem Specimens after Overdose and Therapeutic Use", J. Forensic Sci., 20:340-347, 1975.

25.    DiMaio, V.J.M., Jones, J.A., Caruth, W.W., et.al.   "The Effectiveness of Snub-Nose Revolvers and Small Automatic Pistols", FBI Law Enforcement Bull., 44:10-13, 1975.

26.    DiMaio, V.J.M.   "Homicidal Death by Air Rifle", J. Trauma, 15:1034-1037, 1975.

27.    DiMaio, V.J.M. and Froede, R.   "Allergic Reactions to the Tine Test", JAMA, 233:769, 1975.

28.    DiMaio, V.J.M.   "Two Anaphylactic Deaths Following Chemonucleolysis",  J. Forensic Sci., 21:187-190, 1976.

29.    DiMaio, V.J.M., Petty, C.S., Stone, I.C.   "An Experimental Study of Powder Tattooing of the

Skin", J. Forensic Sci., 21:367-372, 1976.

30.    DiMaio, V.J.M., Garriott, J.C.  "Intravenous Abuse of Propylhexedrine", J. Forensic Sci., 22:152-158, 1977.

31.    DiMaio, V.J.M., Zumwalt, R.E.   "Rifle Wounds from High Velocity Centerfire Hunting Ammunition", J. Forensic Sci., 22:132-140, 1977.

32.    DiMaio, V.J.M., Sturner, W.Q., Coe, J.  "Sudden and Unexpected Deaths After the Acute Onset of Diabetes Mellitus", J. Forensic Sci., 22:147-151, 1977.

33.    Garriott, J.C., DiMaio, V.J.M., Zumwalt, R.E. and Petty, C.S. "Incidence of Drugs and Alcohols in Fatally Injured Motor Vehicle Drivers", J. Forensic Sci., 22:383-389, 1977.

34.    Stone, I.C. and DiMaio, V.J.M.  "Metallic Residues in Gunshot Wounds", AFTE Journal, 9:31-36, 1977.

35.    White, L. and DiMaio, V.J.M.  "Intravenous Propylhexedrine and Sudden Death", NEJM, 297:1071, 1977.

36.    DiMaio, V.J.M., Garriott, J.C.  "Four Deaths Resulting in Abuse of Nitrous Oxide", J. Forensic Sci., 23:169-172, 1978.

37.    Stone, I.C., DiMaio, V.J.M. and Petty, C.S.   "Gunshot Wounds:  Visual and Analytical Procedures", J. Forensic Sci., 23:361-367, 1978.

38.    Kirkpatrick, J. and DiMaio, V.J.M.  "Civilian Gunshot Wounds of the Brain", J. Neurosurgery, 49:185-198, 1978.

39.    Norton, L.E., DiMaio, V.J.M. and Zumwalt, R.E.  "Spontaneous Pneumothorax in the Newborn: A Report of Two Fatalities", J. Forensic Sci., 23:508-510, 1978.

40.    DiMaio, V.J.M. and Garriott, J.C.   "Four Deaths due to Intravenous Injection of Cocaine", Forensic Science, 12:119-125, March/April 1979.

41.    White, K.M. and DiMaio, V.J.M.  "Gunshot Wounds:  Medicolegal Responsibilities of the E.R. Nurse", Journal of Emergency Nursing, 5:29-35, March/April, 1979.

42.    Anderson, R.J., Garza, H.R., Garriott, J.C.  and DiMaio, V.J.M. "Intravenous Propylhexedrine (Benzedrex[R]) Abuse and Sudden Death", Amer. J. Med., 67:15-20, 1979.

43.    Norton, L.E., DiMaio, V.J.M. and Gilchrist, T.F.  "Iron Staining of the Hands in Suicides with Firearms", J. Forensic Sci., 24:608-609, July 1979.

44.    Petty, C.S. and DiMaio, V.J.M.  "The Medical Community and the Medical Examiner", Dallas Medical Journal, 65:288-294, 1979.

45.    DiMaio, S.J., DiMaio, T.M., DiMaio, V.J.M., Nicastri, A.D. and Chen, C.K.   "Oncocytic Carcinoma of the Nasal Cavity:  A Case Report and Review of the Literature", Southern Medical Journal, 73:803-806, 1980.

46.    DiMaio, V.J.M. and DiMaio, S.J.   "Fatal Water Intoxication in a Case of Psychogenic Polydipsia", J. Forensic Sci., 25:332-335, 1980.

47.    DiMaio, S.J., DiMaio, V.J.M. and Kirkpatrick, J.  "Sudden Death due to Primary Intracranial Neoplasm", Amer. J. Forensic Med. and Path., 1:29-46, March 1980.

48.    DiMaio, V.J.M.  "Penetration and Perforation of Skin by Bullets and Missiles - A Review of the Literature", Amer. J. Forensic Med. and Path., 2:107-110, June 1981.

49.    Tate, L.G., DiMaio, V.J.M. and Davis, J.H., "Rebirth of Exploding Ammunition", J. Forensic Sci., 26:636-644, October 1981.

50.    Norton, L.E., Garriott, J.C. and DiMaio, V.J.M.  "Drug Detection at Autopsy:  A Prospective Study of 247 Cases",  J. Forensic Sci., 27:66-71, January 1982.

51.    DiMaio, V.J.M., Copeland, A.R., Besant-Matthews, P.E., Fletcher, L.A. and Jones, A.  "Minimal Velocities Necessary for Perforation of Skin by Airgun Pellets and Bullets, J. Forensic Sci., 27:894-898, October 1982.

52.    Garriott, J.C., DiMaio, V.J.M. and Petty, C.S.  "Death by Poisoning:  A 10-Year Survey of Dallas County", J. Forensic Sci., 27:868-879, October 1982.

53.    DiMaio, V.J.M., DiMaio, S.M., Garriott, J.C. and Simpson, P. "A Fatal Case of Lead Poisoning due to a Retained Bullet", Amer. J. of Forensic Med. and Path., 4:165-169, June 1983.

54.    Garriott, J.C. and DiMaio, V.J.M.  "Death in the Dental Chair:  Three Drug Fatalities in Dental Patients", J. of Toxicology - Clinical Toxicology, 19:987-995, 1982-3.

55.    Norton, L.E., Cottone, J.A., Sopher, I.M. and DiMaio, V.J.M. "The Exhumation and Identification of Lee Harvey Oswald", J. Forensic Sci., 29:1:19-38, January 1984.

56.    Rao, V.J., May, C.L. and DiMaio, V.J.M.  "The Behavior of the Expanding Point of .25 ACP Ammunition in the Human Body", The Amer. J. of Forensic Med. and Path., 5:1:37-39, March 1984.

57.    Garriott, J.C., Rodriguez, R. and DiMaio, V.J.M.  "A Death from Fentanyl Overdose"  J. of Analytic Tox., 8:288-289, Nov/Dec 1984.

58.    DiMaio, V.J.M. and Garriott, J.C.  "How Valid is the 0.10 Percent Alcohol Level as an Indicator of Intoxication?", Pathologist, 39:3:31-33, March 1985.

59.    DiMaio, V.J.M.  "Subscleral Hemorrhage", Amer. J. of Forensic Med. and Path., 6:95, March 1985.

60.    DiMaio, V.J.M., Dana, S.E. and Bux, R.C.  "Deaths Caused by Restraint Vests", JAMA, 255:905, 1986.

61.    Garriott, J.C., DiMaio, V.J.M. and Rodriguez, R.G.  "Detection of Cannabinoids in Homicide Victims and Motor Vehicle Fatalities", J. Forensic Sci., 31:4:1274-1282, October 1986.

62.    DiMaio, V.J.M., Dana, S.E., Taylor, W.E. and Ondruske, J.  "Use of Scanning Electron Microscopy and Energy Dispersive X-ray Analysis (SEM-EDXA) in Identification of Foreign Material on Bullets", J. Forensic Sci., 32:1:38-47, January 1987.

63.    DiMaio, V.J.M. "Sudden Unexpected Deaths due to Massive Non-Traumatic Intra-Abdominal Hemorrhage in Association with Cirrhosis of the Liver", Amer. J. For. Med. and Path., 8(3):266-

268, 1987.

64.  DiMaio, V.J.M. and Dana, S.E.  "Deaths Caused by Carbon Monoxide Poisoning in an Open Environment (Outdoors)", J. of Forensic Sci., 32:6:1794-1795, November 1987.

65.  DiMaio, V.J.M. and DiMaio, D.J.M. "Natural Death As Viewed By The Medical Examiner: A Review of 1000 Consecutive Autopsies of Individuals Dying of Natural Disease" J. of Forensic Sci., 36(1): 17-24, January 1991.

66.  DiMaio, V.J.M. and Kaplan, J.A. "An Unusual Entrance Wound Associated With Rimfire Rifles".  Amer. J. For. Med. and Path. 12(3):207-208, 1991.

67.  DiMaio, V.J.M., Editorial. Amer. J. For. Med. and Path. 13(1):1, 1992.

68.  Holmes, J.H. IV, Guileyardo, J.M., Barnard, J.J. and Di Maio, V.J.M.  "Pressure Sores in a Christian Science Sanatorium."  Amer. J. For. Med. and Path. 14(1):10-11, 1993.

69.  Zivot, U. and Di Maio, V.J.M., "Motor Vehicle-Pedestrian Accidents in Adults: Relationship Between Impact Speed, Injuries, and Distance Thrown" Amer. J. For. Med. & Path. 14(3):185-186, 1993

70.  Di Maio V.J.M. and Di Maio D.J.M.,  "Incidence of Coronary Thrombosis in Sudden Death due to Coronary Artery Disease" Amer. J. For. Med. & Path. 14(4):273-2, 1993

71.  Cina S.J., Di Maio V. and Smialek J.E., "Suggested Guidelines for Platform Presentations". Amer. J. For. Med. & Path. 19(1):54-56, 1998

72.  Kaplan J., Klose R., Fossum R. and Di Maio V.J.M., "Centerfire Frangible Ammunition: Wounding Potential and Other Forensic Concerns". Amer. J. Forensic Med. & Path. 19(4):299-302, 1998

73.  Milovanovic A.V. and Di Maio V.J.M., "Death Due to Concussion and Alcohol". Amer. J. For. Med. & Path. 20(1):6-9, 1999

74.  Di Maio VJ.M., "Homicidal Asphyxia". Amer J. Forensic Med. & Path. 21(1):1-4, 2000

75.  Kohlmeier RE, Di Maio VJM and Kagan-Hallet K. "Fatal hyperthermia in hot baths in individuals with multiple sclerosis". Amer. J. Forensic Med. & Path. 21(3):201-203. 2000

76.  Di Maio V.J.M. and Francis J.R. "Hetertopic Ossification in Unidentified Skeletal Remains". Amer. J. Forensic Med. & Path. 22(2):160-164. 2001

77.  Kohlmeier RE, McMahan CA and Di Maio VJM. "Suicide by Firearms: A 15-year experience". Amer. J. Forensic Med. & Path. 22(4):337-340. 2001

78.  Di Maio, VJM and Di Maio, TG.  "Homicide by decubitus ulcers" Amer. J. Forensic Med. & Path. 23(1):1-4. 2002

79.  Molina DK and Di Maio VJM. "The Reliability of immunoassay for determining the presence of opiates in the forensic setting". Amer. J. Forensic Med. & Path. 26(4):303-304. 2005

80.  Molina DK, Martinez M, Garcia J, DiMaio VJ "Gunshot Residue Testing in Suicides: Part I Analysis by SEM/EDX. *The American Journal of Forensic Medicine and Pathology.* (in press).

81.    Molina DK, Castorena J, DiMaio VJ "Gunshot Residue Testing in Suicides: Part II Analysis by ICP/AES. *The American Journal of Forensic Medicine and Pathology*.  (in press).

82.    Molina DK, Wood L, DiMaio VJ Shotgun Wounds: A Review of Wound Location, Range of Fire and Manner of Death. *The American Journal of Forensic Medicine and Pathology.* (in press).

83.    Molina DK, Nichols JJ, DiMaio VJ "The Sensitivity of CT Scans in Diagnosing Trauma".  The Journal of Trauma (in press).'

## <u>SCIENTIFIC LETTERS</u>

1.    Henry L., and DiMaio, V.J.M.  "Pulmonary Edema and Propoxyphene", JAMA, 215:2115, 1971.

2.    DiMaio, V.J.M.  "Forensic Pathology", NEJM, 295:735, 1976.

3.    DiMaio, V.J.M.  "The Pathologist as Expert Witness", Correspondence - Human Pathology 17:205-          206, February 1986.

4.    DiMaio, V.J.M.  "SIDS or Murder" (Letter)  Pediatrics, 81(5):747, May, 1988

5.    DiMaio, V.J.M., Dana, S.E., & Bux, R.C. "Sudden Cardiac Death" (Letter)  NEJM, 322:271, January, 1990.

6.    DiMaio, V.J.M., "Assault Weapons as a Public Health Hazard" (Letter) JAMA, 268:3073, 1992

7.    DiMaio, V.J.M., "Discussion of Practical Approach to Investigative Ethics and Religious Objections to Autopsy." (Letter) J. of Forensic Sci. 38(2):233, 1993

8.    DiMaio, V.J.M., "Assisted Death and Physician-Assisted Suicide." (Letter) NEJM 328(13):965, 1993

9.    DiMaio, V.J.M., "Child Abuse and Apparent Life-threatening events" (Letter;comment) Pediatrics                               96(1Pt 1):168, 1995.

10.    DiMaio, V.J.M., "Medical Examiners, Forensic Pathologists, and Coroners"  (Letter) JAMA 277(7):531, 1997.

11.    DiMaio,V.J.M., "The Shaken-Baby Syndrome".  (Letter) NEJM, 339(18):1329. 1998 Oct

12.    Di Maio VJM  Repeat sudden unexpected infant deaths. (Comment.Letter). Lancet. 2005 365:1137-1138.

## BOOK CHAPTERS

1. Dana S. and Di Maio V.J.M. "Gunshot Trauma", In Payne-James, J., Busuttil, A. & Smock, W. eds. Forensic Medicine: Clinical and Pathological Aspects. 2003, Greenwich Medical Media. London.

2. DiMaio, V.J.M. "Shotgun Wounds", In: Froede, R.C. eds. Handbook of Forensic Pathology, Published by College of American Pathologists, 2nd ed, 2003:185-188.

3. DiMaio, V.J.M. "Characteristics of Wounds Produced by Handguns and Rifles". In: Froede, R.C., eds. Handbook of Forensic Pathology, Published by College of American Pathologists, 2nd ed. 2003:175-183.

4. DiMaio, V.J.M. "Wounds from Civilian and Military Rifles", In: Froede, R.C. Clinics in Laboratory Medicine, Forensic Pathology, Part II, W.B. Saunders Co., Phil., PA, 1998,18(2):189-201

5. DiMaio, V.J.M. "Shotgun Wounds", In: Froede, R.C. eds. Handbook of Forensic Pathology, Published by College of American Pathologists, 1990:227-231.

6. DiMaio, V.J.M. "Characteristics of Wounds Produced by Handguns and Rifles". In: Froede, R.C., eds. Handbook of Forensic Pathology, Published by College of American Pathologists, 1990:217-225.

7. DiMaio, V.J.M. "Basic Principles in the Investigation of Homicides", Pathology Annual: 1984, Part 2, Sommers, S.C. and Rosen, P.P., Editors, Appleton-Century,Crofts, Norwalk, CT, 1984.

8. DiMaio, V.J.M. "Trace Evidence and the Pathologists", Symposium on Forensic Path. -Clinics in Lab. Med. 3(2):355-366, June 1983, W.B. Saunders Co., Phil., PA.

9. DiMaio, V.J.M. "Wounds Caused by Centerfire Rifles", Symposium on Forensic Path. -Clinics in Lab. Med., 3:2:273-294, June 1983, W.B. Saunders Co., Phil., PA.

10. DiMaio, V.J.M. and Petty, C.S., Chapter 25, "Multiple Death Investigations", Modern Legal Medicine, Psychiatry and Forensic Science, Curran, W.J., McGarry, A.L. and Petty, C.S., F.A. Davis Co., Phil., PA, 1980.

## TECHNICAL MANUALS

1. DiMaio, V.J.M., "9MM VS .45 ACP", in Wound Ballistic Workshop, FBI Academy, September 15 - 17, 1987 "9MM VS .45 AUTO"

2. DiMaio, V.J.M., "Summary of Remarks", in Wound Ballistic Workshop Presentations, FBI Academy, January 19 - 22, 1993

# EXHIBIT
# "6"

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MARK DELEON** | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. SA-07-CA-0751-FB** |
| | § | |
| **CITY OF SAN ANTONIO, TEXAS, and** | § | |
| **DAVID BIERMAN, Individually and in His** | § | |
| **OFFICIAL CAPACITY** | | |
| *Defendants* | | |

## <u>AFFIDAVIT OF ALBERT RODRIGUEZ</u>

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF TRAVIS** | § |

**BEFORE ME**, the undersigned authority, on this day personally appeared ALBERT RODRIGUEZ, who having first been duly sworn, upon his oath deposed and testified as follows:

1. "My name is ALBERT RODRIGUEZ.  I am over the age of 21, of sound mind, competent to testify and have personal knowledge of the facts contained herein.  All of my opinions and observations stated in this Affidavit are within my personal knowledge, and are based on my law enforcement training and experience, and are based on the matters I personally reviewed.

2. I am presently employed as the Commander of the Training Academy for the Texas Department of Public Safety.  I was employed by the Texas Department of Public Safety (DPS) as a patrol officer in 1977, and was a Highway Patrol Trooper for approximately five (5) years. In 1982, I was promoted to the rank of Training Officer at the Training Academy.  I served in that position for two (2) years.  I was then promoted to Staff Development Specialist I and served in that capacity until 1989.  In 1989, I was promoted to the rank of Lieutenant in the Training Academy.  In March of 1993, I was promoted to Commander of the DPS Training

Academy in Austin, Texas and presently hold that position. I have been employed by the DPS as a law enforcement officer for over thirty-one (31) years. I am a licensed Texas Peace Officer and have met all of the standards for licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education.

3. I hold a Bachelors Degree in Education from Texas A&M in Kingsville, Texas. I also hold Advanced, Instructors', and Masters' certifications from the Texas Commission on Law Enforcement Officer Standards and Education. I am a graduate of the 147th FBI National Academy in Quantico, Virginia. I have been certified for over twenty (20) years as a defensive tactic's instructor, firearms' instructor and as an emergency medical technician. I am certified by the Federal Bureau of Investigation (FBI) as a Use of Force and Defensive Tactics Instructor. I have attended over six thousand (6,000) hours of various law enforcement seminars and schools throughout the United States.

4. In my career with the DPS, I have studied and attended seminars on the issues of policies and procedures, use of force, use of deadly force, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, constitutional law, firearms, police officer involved shootings, in-custody deaths, shooting reconstruction, choke and neck restraint holds, and officer safety. I have also instructed classes in the areas of patrol procedures, probable cause, defensive tactics, choke and neck restraint holds, oleoresin capsicum (pepper spray), ASP Expandable police baton, officer safety, arrest procedures, use of force, use of deadly force, use of force in jail settings, in-custody deaths, law enforcement policies and procedures, firearms, investigation of police officer involved shootings, shooting reconstruction, police supervision, first aid and many other subjects. I have been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force, use of deadly force, use of force in jail settings, policies and procedures, reasonable suspicion, probable cause, arrest procedures, driving procedures, police supervision, firearms, officer safety, Texas criminal laws, Texas traffic laws, law enforcement training, and police investigations.

5. I am a member of the FBI National Academy Graduates Association, Texas Police Association, Texas Department of Public Safety Officer's Association, Texas Sheriff's Association, and International Law Enforcement Educators and Trainers Association. I have served on the Southwest Texas State University Criminal Justice Advisory Board, Texas Alcohol

*Affidavit of Albert Rodriguez*                                        2

Beverage Commission, and the Austin Community College Law Enforcement Advisory Board.  I have instructed at the FBI Academy in Quantico, Virginia; Northwest University in Jacksonville, Florida; Texas Attorney General's Annual Law Enforcement Conferences in Austin, Texas; and various other locations throughout the United States, Canada, and Mexico.

6. I have technical, professional and other specialized knowledge that will assist a trier of fact in understanding the facts and issues in the above-captioned lawsuit.  The facts and data on which I base my opinions are of a type reasonably relied upon by experts in the field of law enforcement in forming opinions or inferences therefrom.

7. The attached resume contains a more complete listing of my training and qualifications and is provided for reference of my experience, education, training, and skills which is incorporate herein by reference the same as if set forth at length herein.

## RESEARCH AND ASSESSMENT

8. My opinions and observations in this affidavit are based on having visited the incident site, interviewed Officer Bierman, and having reviewed and researched the following documents: 1) Plaintiff's Second Amended  Original Complaint, 2) San Antonio Police Department Internal Affairs Unit Investigation Report, 3) Sworn Statement of Officer Mark Bishop, 4) Internal Affairs' Interrogatory of Officer Bishop, 5) Sworn Statement of Officer David Bierman, 6) Internal Affairs' Interrogatory of Officer Bierman, 7) Crime Scene Photographs, 8) Crime Scene Diagram, 9) Photographs of Officer David Bierman and Mark Bishop, 10) Use of Force Report prepared by Officer Bierman, 11) Statement of Bianca Dominguez, 12) Statement of Holly M. Creekmore, 13) Statement of Dustin Smith, 14) Statement of Delphia Dominguez, 15) Statement of Evan Philip Couch, 16) Statement of Dominique Lenzy, 17) San Antonio Police Department Offense and Supplemental Reports reference Incident, 18) Deposition of David Bierman and exhibits, 19) Deposition of Mark DeLeon, 20) Deposition of Robert A. DeLorenzo, MD. 21) Report of Vincent J.M. DiMaio, MD., 22) Texas Commission on Law Enforcement Officer Standards and Education Basic Peace Officer Training Curriculum, 23) Texas Commission on Law Enforcement Officer Standards and Education Intermediate Use of Force Training Curriculum, 24) Texas Commission on Law Enforcement Officer Standards and Education Intermediate Arrest, Search, and Seizure, 25) Texas Penal Code, 26) Texas Code of Criminal Procedure, 27) United State Supreme Court Decision on *Graham v Conner*, 28) United

States Supreme Court *Tennessee v Garner,* and 29) the United States Supreme Court Decision on *Katz v Saucier.*

## SUMMARY OF RELEVANT FACTS

9. The information provided to me and the materials researched revealed that on May 8, 2007, San Antonio Police Officers David Bierman and Mark Bishop were patrolling together in an unmarked San Antonio Police Department car and were wearing regulation San Antonio Police Department uniforms. Officer Bishop was driving the unmarked car. Officers Bishop and Bierman decided to work the Northern Hills due to the large number of recent burglaries in the area.

10. At approximately 11:50 p.m., Officers Bishop and Bierman were driving past the cul-de-sac on Bellcrest Street. As they drove by the cul-de-sac, they observed two vehicles illegally parked on Bellcrest Street. The vehicles were parked in the middle of the street, head on to the curb, instead of parallel to the curb. In the process of observing, Officer Bierman noticed four persons standing by the vehicles. Officer Bierman relayed his observations to Officer Bishop. Officer Bishop made a U-turn and drove in the direction of the illegally parked vehicles.

11. As the officers approached the illegally parked vehicles, Officer Bierman noticed that one of the vehicles was a red extended cab truck and the other was a Chevrolet Impala passenger car. Officer Bierman further observed that there were two male subjects outside on the passenger side of the truck and two male subjects outside the driver's side of the Impala car.

12. The officers drove the unmarked car to the location of where the illegally parked vehicles were and stopped. Officer Bierman stepped out of the patrol car and instructed the four persons that he had observed to "Let see your hands, put them on the car." Officer Bierman repeated the commands several times. The four males subjects looked directly at Officer Bierman and they all complied by placing their hands on the vehicles they were standing by.

13. Officer Bierman was watching the two male subjects that were standing by the truck and Officer Bishop was watching the other two male subjects that were standing near the passenger car. As Officer Bierman was watching the two male subjects that were standing by the truck, a male subject exited the truck from the driver's door side. Officer Bierman had not seen anyone inside the truck and was surprised by the male subject that exited the truck.

14. Officer Bierman instructed the male subject exiting the truck to place his hands on the truck. Officer Bierman repeated the commands several times. The male subject complied but only after numerous commands. As this was occurring, another male subject exited the passenger car. The male subject, upon exiting the passenger car, looked at Officer Bierman and immediately got back into the car. Officer Bierman believed that his and Officer Bishop's safety was being compromised because he believed that the male subject might have gotten back into the passenger car to retrieve a gun. In addition, the Officer Bierman noticed that the subjects were exhibiting high levels of anxiety.

15. Officer Bierman had his flashlight in his left hand and unholstered his service pistol with his right hand. Officer Bierman instructed the male subject to get out of the car and to let him see his hands. The male subject exited the passenger car. Officer Bierman noticed that the male subject was holding something in his hands. Officer Bierman pointed the pistol in the general direction of the male subject and suspect dropped what he had in his hands. Officer Bierman noticed that what he had dropped was clothing and a compact disc (CD) case. The male subjects then complied with Officer Bierman's commands and placed their hands on the passenger car.

16. At one point, Officer Bierman noticed some body movements originating from the passenger side of the truck and noticed one of the male subjects, later identified as Mark DeLeon, appeared to have taken something out of the cab of the truck through the truck's driver side window. DeLeon was first observed in the area of the back door of the truck and the bed of the truck. As DeLeon was withdrawing his hand from inside the cab of the truck, Officer Bierman observed a shiny, metallic looking item in DeLeon's right hand. Officer Bierman had his flashlight and his pistol pointed in the general direction of DeLeon. Officer Bierman believed that DeLeon was in possession of a chrome plated pistol. Officer Bierman feared for his and Officer Bishop's life.

17. DeLeon commenced to hurriedly walk and/or run away from Officer Bierman's position. Officer Bierman yelled at DeLeon, "Let's see hands, come here, Stop!" DeLeon did not comply. DeLeon was walking/running with his right hand down by his side. Officer Bierman believed that he could see the butt of a pistol in DeLeon's right hand. Officer Bierman heard DeLeon say something to the effect of "Fuck this shit!" and start to turn to his left and towards Officer Bierman. As DeLeon was turning, Officer Bierman observed DeLeon raised his right

hand parallel to the ground.  The right hand is where Officer Bierman has noticed the shiny metallic object in DeLeon's possession and believed it was a handgun.   Officer Bierman believed that DeLeon was about to shoot him.   Officer Bierman fired one shot at DeLeon. Officer Bierman observed what he believed to be a shiny metallic pistol leave DeLeon's hand and towards DeLeon's right side.

18. Officer Bierman observed DeLeon fall to the ground.  Officer Bierman also noticed that DeLeon reached into the groin area and shortly thereafter commenced to attempt to pull his hand out.  Officer Bierman did not fire any additional shots.  Officer Bierman ran up to DeLeon and immediately handcuffed him.  Officer Bierman shined his flashlight at the shiny metallic object that had been in possession of DeLeon's right hand and noticed that it was in fact shiny but instead of being metallic he discovered that it was a clear shiny plastic baggie.  In addition, a lock blade knife was later found in the immediate area of where DeLeon had fallen to the ground.

19. Officer Bierman called the dispatcher and requested more officers and Emergency Medical Services (EMS).  Officer Bierman remained with DeLeon as Officer Bishop handled the other subjects.  DeLeon was transported to Brooke Army Medical Center.  DeLeon was treated and released at a later time.

20. It was later discovered that DeLeon was struck in the left shoulder with the entrance wound being in the front of the shoulder and the exit wound being to the back of the shoulder. The shiny plastic baggie that DeLeon was holding in his right hand as he turned was a baggie of Marijuana.

21. Phillip Evan Couch was one of the individuals present during the shooting incident. Couch recalls two uniformed officers arriving and telling everyone to put their hands on the vehicles.  Couch indicated that DeLeon had his hands on the passenger side of the truck by the bed of the truck.  Couch stated that he recalled seeing DeLeon making a movement and that he did not see anything in DeLeon's hand when the movement was made.  Couch heard one shot and observed DeLeon go down to the ground.

22. Witness Delphia Dominguez indicated that she was asleep in the car when she heard, "pop, pop."

23. Witness Bianca Dominguez stated that a tan "undercover" police car pulled up and two uniformed officers got out of the car.  Bianca indicated that Officer Bierman was yelling at

everyone to put their hands on the car. Bianca observed DeLeon move from the corner of her eye and remembers Officer Bierman stating something to the effect of "stop" and possibly "stay still." Bianca was not sure if DeLeon walked or ran towards Couch's house. She reported that Officer Bierman was approximately fifteen feet behind DeLeon with his pistol unholstered. Bianca reported that Officer Bierman fired one shot and DeLeon fell to the ground.

24. Witness Dustin Smith reports that five to eight San Antonio Police Department cars pulled up and surrounded the vehicle he was in. He states that four of the patrol cars were marked patrol cars equipped with emergency lights. Smith states that they were ordered out of the truck with the officer having his gun drawn. Smith indicates that he heard a single gunshot and saw a muzzle flash protruding from the officer's gun. Smith reports that DeLeon was getting out of the truck when the officer shot DeLeon. Smith reports that DeLeon was approximately four feet in front of him and was moving towards the front of Couch's truck. Smith reported that the officer was approximately ten feet from DeLeon when the shot was fired.

25. Witness Holly Creekmore recalls a tan car pulling up and seeing San Antonio Police Officers exiting from the car. She indicates that the officers were ordering everyone to put their hands on the truck. She stated that the officer was pointing a gun at them. Creekmore reported that DeLeon took off running looking over his shoulder when he was running. Creekmore stated that DeLeon had Marijuana in his pocket and a baggie of Marijuana in his hand. After the shot was fired, Creekmore reports that DeLeon fell to the ground. She recalls the officer approaching DeLeon and handcuffing him. According to Creekmore, after locating the Marijuana that DeLeon dropped, the officer said, "it's just marijuana." Creekmore reports that DeLeon kept asking the officer, "why did you shoot me?" The officer replied, "you had something in your hands and you were running."

26. Witness Arron Lenzy reports that a tan four door car pulled in behind the Impala passenger car. Lenzy indicates that two individuals exited the tan car and they were not wearing police uniforms. Lenzy states that the two individuals had their guns drawn and told them that they were the police and for them to place their hands on the car. Lenzy further reports that everyone put their hands on the car except for DeLeon. Lenzy indicates that DeLeon turned around and the officer shot him. Lenzy states that DeLeon never tried to run away from the officer.

27. Witness Dominque Lenzy reports that she noticed a car drive up by them, the car did a U-turn, and then the car pulled in behind them. Dominque stated that he got out of the car to see who had pulled in behind them. He states that he observed a San Antonio Police Officer in uniform with his gun drawn. Dominque reports that he was holding clothes and that he dropped them and put his hands up in the air. Dominque noticed that their were a total of two San Antonio Police Officers and that they were ordering them to put their hands on the cars. Dominque reported that he heard the officers say, "don't move, don't move," and then heard a gunshot coming from behind him. Dominque states that he never turned around and that Smith and Couch had informed him that DeLeon had been shot.

## OPINIONS AND OBSERVATIONS

28. My evaluation of Officer David Bierman's actions were evaluated from the standpoint of what actions a reasonable and prudent law enforcement officer could have taken when presented with the same or similar circumstances. Officer Bierman's actions were evaluated from the standpoint of the information known and perceived by him at the time Mark DeLeon walked/ran away with a shiny reflective object in his hand then turned towards him, with consideration given to the fact, that at times, law enforcement officers are required to make split second decisions in tense, rapidly evolving, and dangerous circumstances. The analysis is from that vantage point of on scene officer and NOT evaluated from a 20/20 hindsight perspective.

### Course and Scope

29. In my professional opinion, the evidence unequivocally indicates that Officer David Bierman's actions, in connection with Mark DeLeon, were within the course and scope of his law enforcement authority. The undisputed evidence indicates that on May 8, 2007, Officer Bierman was and continues to be employed as a licensed peace officer by the San Antonio Police Department and was and continues to be a Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) licensed police officer.

30. On May 8, 2007, Officer Bierman was working an assigned shift, was a passenger in a San Antonio Police Department marked patrol car driven by Officer Mark Bishop, and was wearing a regulation San Antonio Police Department uniform that clearly identified him as a police officer. The undisputable evidence indicates that Mark DeLeon knew that Officer

Bierman was a police officer at the time that Officer Bierman attempted to detain him and ordered him to stop.

31. In my expert opinion, the evidence indicates that Officers Mark Bishop and David Bierman had probable cause and reasonable suspicion to detain the individuals that were around the vehicles that were positioned on the cul-de-sac of Bellcrest Street as a result of two vehicles being illegally parked. The vehicles were parked in the middle of the street, head on to the curb instead of parallel to the curb. The officers did not know who the drivers of the illegally parked vehicles were at the time. Officers Bishop and Bierman had probable cause and reasonable suspicion to detain the individuals for investigative purposes.

32. Law enforcement officers are trained and understand that in order to "Stop and Detain" persons, at a minimum, "Reasonable Suspicion" must exist. The reasonable suspicion standard pursuant to law enforcement training is a standard that involves a level of belief, which is something less than the probable cause standard needed to support an arrest. Law enforcement officers are also trained to understand that, in order to justify such an intrusion, they must be able to point to specific articulable facts, which taken together with rational inferences from those facts, collectively provide a particularized and objective basis for suspecting the persons detained of violating the law.

33. The higher standard of "probable cause" is required to justify an arrest. Probable cause pursuant to law enforcement training is articulable facts and circumstances that would lead a reasonable law enforcement officer to believe that a crime has been committed.

34. In opinion, any reasonable law enforcement officer could have believed that probable cause and reasonable suspicion existed due to the vehicles being illegally parked in violation of the Texas Transportation Code. The two vehicles observed by Officers Bishop and Bierman were in violation of the Transportation Code 545.303, Additional Parking Regulations; *"(a) An operator who stops or parks on a two-way roadway shall do so with the right-hand wheels of the vehicle parallel to and within 18 inches of the right-hand curb or edge of the roadway."* The evidence clearly indicates Officers Mark Bishop and David Bierman were attempting to address the violation of the Texas Transportation Code by attempting to detain the suspected violators. Officers Bishop and Bierman's actions were within the course and scope of their law enforcement authority.

35. In my professional opinion, the evidence indicates that probable cause existed for the detention of Mark DeLeon and the persons that were in close proximity to the illegally parked vehicles. The drivers of the vehicles had not been identified. When DeLeon ran/rapidly walked away, probable cause existed for his arrest, pursuant to the Texas Penal Code, Section 38.04. Evading Arrest or Detention *"(a) A person commits an offense if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or detain him. (b) An offense under this section is a Class B misdemeanor, except that the offense is: (1) a state jail felony if the actor uses a vehicle while the actor is in flight and the actor has not been previously convicted under this section."* DeLeon committed the offense of Evading Arrest/Detention.

36. At times law enforcement officers are required to use force and/or deadly force to protect themselves, protect the public, and/or to effectuate an arrest. The use of deadly force by police officers in protecting their own lives and/or the lives of others is within the course and scope of a law enforcement officer's authority pursuant to the United States Constitution, Texas Penal Code, Texas Code of Criminal Procedure, and the Texas Commission on Law Enforcement Officer Standards and Education.

37. It is not my intent to interpret the law but when evaluating Officer Bierman's use of deadly force pursuant to law enforcement training, the evidence indicates that Officer Bierman's actions were within the course and scope of his law enforcement authority pursuant to law enforcement training on the following legal authorities:

A) United States Supreme Court Decision on *Tennessee v Garner*

B) United States Supreme Court Decision on *Graham v Connor*

C) Texas Penal Code § 9.32. Deadly force in defense of person. "(a) A person is justified in using deadly force against another: (3) when and to the degree he reasonably believes the deadly force is immediately necessary: (A) to protect himself against the other's use or attempted use of unlawful deadly force; or (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery."

D) Texas Penal Code § 9.51. Arrest and Search. "(c) A peace officer is justified in using deadly force against another when and to the degree the peace officer reasonably believes the deadly force is immediately necessary to make an arrest,

or to prevent escape after arrest, if the use of force would have been justified under Subjection (a) and: (1) the actor reasonably believes the conduct for which the arrest is authorized included the use or attempted use of deadly force; or (2) the actor reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to the actor or another if the arrest is delayed".

Discretionary versus Ministerial Law Enforcement Functions

38. In my professional opinion, the undisputable evidence indicates that Officer Bierman was performing discretionary law enforcement functions in connection with the tense and dangerous situation that he encountered and that had been created by Mark DeLeon. In the law enforcement profession there is an indefinite number of circumstances that law enforcement officers may encounter when dealing with multiple persons in high crime areas.

39. Law enforcement officers are trained to evaluate the totality of the circumstances as viewed from their vantage point and to use their judgment and discretion at arriving at a reasonable course of action. If in fact, there were a finite number of circumstances that could be identified, law enforcement officers would not be required to use their judgment or discretion. Law enforcement officers would be trained on the specific number of circumstances and would be instructed to respond with specific actions and/or sets of procedures. Unfortunately, no such list of specific circumstances exist, thus law enforcement officers are required to use their judgment and discretion.

40. The evidence in this case revealed that Officer Bierman had to use his judgment and discretion on the following law enforcement functions but not limited to:

    a. The manner in attempting to detain the multiple persons that were in the immediate area.

    b. Analyzing the fact that there had been reports of recent burglaries in the area.

    c. In evaluating the fact that upon approaching the parked vehicles, additional persons exited the illegally parked vehicles.

d. In evaluating the fact that after they instructed the persons to place their hands on the vehicles, the persons continued to move around and exhibited escalated levels of anxiety.

e. In considering that it was close to midnight and it was dark and not all movements and/or what was in the suspects hands could be easily identified by the officers.

f. In evaluating the fact that a person got back into a vehicle after the persons were instructed to place their in time to unholster his pistol.

g. In evaluating DeLeon's initial actions with the shiny object in his hands that Officer Bierman reasonably believed to be a pistol

h. In analyzing the fact that DeLeon evaded arrest/detention by fleeing with a shiny object in his hand.

i. In evaluating the fact that DeLeon did not comply and/or stop when ordered to do so.

j. In evaluating the fact that DeLeon did not immediately raise his hands and make them visible as expected upon being instructed to do so by Officer Bierman.

k. In evaluating DeLeon's hand that contained the shiny object and the movements of the hand.

l. In evaluating the fact that DeLeon was turning towards him with the shiny object that he believed to be a pistol.

m. In deciding whether to wait and confirm if the shiny object that DeLeon possessed was a pistol and be shot or to use deadly force against DeLeon due to reasonably believing that DeLeon was about to shoot at him.

41. Officer Bierman was required to evaluate the totality of the circumstances and use his judgment and discretion in the aforementioned legitimate law enforcement functions. It is important to note that there are no law enforcement manuals or training that specifically outlines a step by step procedure in handling multiple suspects or a suspect that is believed to be in possession of a pistol. Each situation is unique and requires law enforcement officers to use their judgment and discretion.

**Reasonableness of Officer Bierman's Actions**

42. Based on the totality of the circumstances that existed in this case, Officer Bierman's actions in connection with DeLeon's life threatening actions were objectively reasonable.   In evaluating Officer Bierman's actions pursuant to law enforcement training on the United States Supreme Court Decisions on *Graham v Conner* and *Tennessee v Garner*, the evidence indicates that Officer Bierman's actions and use of deadly force were objectively reasonable.  In fact, the evidence indicates Officer Bierman's actions are an excellent example for law enforcement training on how the United States Supreme Court Decision in *Graham v Connor* applies to practical situations.

43. Officer Bierman's actions in connection with DeLeon were not only in compliance with the United States Constitution pursuant to law enforcement training but were also in compliance with the Texas Penal Code, and the Texas Commission on Law Enforcement Officer Standards and Education.  Any reasonable and prudent law enforcement officer when presented with the same or similar circumstances that DeLeon created and that required Officer Bierman's response could have reasonably believed that DeLeon presented an imminent threat of serious bodily injury and/or death at the time that deadly force was used by Officer Bierman.

44. The totality of the circumstances that Officer Bierman encountered included the following but not limited to:

1) Officer Bierman was aware of the reported criminal offenses of burglaries in the area where he and Officer Bishop were going to attempt to detain the suspects.

2) There were multiple suspects.

3) There were additional suspects that exited the vehicles upon Officers Bierman and Bishop attempting to detain the initial suspects.

4) The suspects continued to move around even after they were ordered to place their hands on the vehicles; they did not immediately comply.

5) It was close to midnight, dark, and not all suspect movements could be identified nor could the officers easily identify what the suspects might have in their hands.

6) Mark DeLeon had a shiny reflective object in his hand that Officer Bierman reasonably believed to be a chrome plated pistol.

7). DeLeon moved his hands away from the vehicles in contradiction to the officers' commands.

8) Officer Bierman personally observed DeLeon evade arrest/detention by intentionally fleeing with the shiny reflective object in his right hand.

9) DeLeon did not stop when ordered to stop.

10) DeLeon did not stop nor did he raise hands; DeLeon was not complying.

11) Officer Bierman anticipated that if DeLeon was going to surrender that he would raise his hands up in the air and stop.

12) Officer Bierman personally observed DeLeon place his hand in a position that would indicate to any reasonable and prudent law enforcement officer, considering the totality of the circumstances that existed, that DeLeon was in possession of a pistol.

13) DeLeon commenced to turn to his left with the shiny reflective object in his right hand which was parallel to the ground as perceived by Officer Bierman.

14) Officer Bierman perceived that DeLeon's right hand was in a position to shoot at him as he was turning.

15) Officer Bierman was well aware that action is faster than reaction and that if he waited until he could completely confirm what DeLeon had in his hand that he could be shot.

16) Officer Bierman reasonably believed that his and Officer Bishop's life were in imminent danger of death as a result of DeLeon's actions and that the use of deadly force was immediately necessary to neutralize DeLeon's life threatening actions.

45. Contemporary law enforcement training does not advocate for police officers to wait until they positively confirm that a suspect does have a weapon before the use of deadly force is justified; if that was the case many more law enforcement officers would be killed due to the fact that a suspect's actions are going to be faster than the officer's reaction. Law enforcement training specifically addresses the fact that a suspect can turn and shoot before an officer can return fire. Even if the officer is able to shoot at the same time that the suspect fires it is of no

advantage to the officer; the officer has allowed the suspect to shoot at him and he could be killed.

46. Law enforcement officers throughout the United States are trained to understand that an officer must have a "reasonable belief" that the suspect is armed and not a "confirmed, one hundred percent accurate belief" that the suspect is armed.  Officer Bierman did not use deadly force because he thought that DeLeon "might" have a gun; he used deadly force because he had a "reasonable belief" that DeLeon was armed and that DeLeon presented an imminent threat of serious bodily injury and/or death.  The "reasonable belief" existed as a result of the totality of the circumstances that DeLeon created.  The fact that the shiny object that DeLeon had in his hand ended up being a plastic baggie of Marijuana is irrelevant.  Considering that particular issue in my opinion is 20/20 hindsight evaluation which in contradiction on how officers are trained on the United States Supreme Court Decision in *Graham v Connor*.

47. There is no dispute and/or fact issue related to the fact that DeLeon fled on foot, had a shiny reflective object in his right hand, and DeLeon was running/hurriedly walking away from Officer Bierman's location.  Mark DeLeon and other witness confirm these facts.

48. It is true that after the fact, it was discovered that what Mark DeLeon had in his right hand was a plastic baggie that contained Marijuana.  The plastic baggie confirms the fact that Officer Bierman observed a shiny reflective object in his right hand.  There is no fact issue as to whether DeLeon had a shiny reflective object in his right hand.

49. The physical evidence indicates that DeLeon made a turning motion towards Officer Bierman as he was running and/or rapidly walking away.  DeLeon made a turning motion to his left as described by Officer Bierman.  DeLeon's medical records and Doctor DiMaio's report indicate that the projectile **entered** his left **front** shoulder area and **exited** to the **back** of the shoulder.  The entrance of the projectile on the front left shoulder area confirms DeLeon's turning motion to the left.  DeLeon got shot as he turned, thus the projectile exited the back shoulder area.  There is no evidence to dispute Doctor DiMaio's analysis of the entrance and exit wound.  The physical evidence unambiguously contradicts the allegation that DeLeon was shot in the back as he ran/hurriedly walked away.

50. The evidence indicates that Officer Bierman was to the rear of DeLeon as he hurriedly walked/ran away from Officer Bierman's location.  The entrance wound is to the front of the left shoulder.  If DeLeon would have merely been running away when he got shot, it is

obvious that the entrance wound would have been in the back of the shoulder and not the front. The projectile would have entered the back of the shoulder and the path of the projectile would have been back to front. The evidence indicates that the path of the projectile in this case was front to top back which confirms that fact that DeLeon turned towards Officer Bierman.

51. The physical evidence confirms the events as reported by Officer Bierman. Any reasonable and well trained law enforcement officer could have perceived DeLeon's turning motion towards Officer Bierman as a life threatening movement and more so when the fact is considered that DeLeon had a shiny reflective object in his right hand that any reasonable law enforcement officer could have believed it to be a pistol, in light of the circumstances.

52. Officer Bierman had no other reasonable alternative but to use deadly force unless Officer Bierman chose the alternative of waiting to see whether DeLeon was going to kill him or not; waiting to see if DeLeon was going to shoot or not, was not a reasonable alternative. Officer Bierman did not have cover and/or concealment that he could have utilized at the time that DeLeon turned towards him; taking or seeking cover was not an option, it was not available.

53. Officer Bierman believed that he was approximately 21 feet behind DeLeon at the time DeLeon made the turning movement. Other estimates of 10 -15 feet have been provided. The use of a police baton, Oleoresin Capsicum (pepper spray), and/or any Weaponless Control technique were not options under the given circumstances and distances.

54. It is important to note that Officer Bierman's use of deadly force was not deployed to merely effectuate DeLeon's arrest and/or because he was fleeing. Officer Bierman used deadly force because he believed deadly force was immediately necessary to save his and Officer Bishop's life.

55. In evaluating Officer Bierman's actions from the standpoint of what a reasonable law enforcement officer could have believed and/or perceived at the time and not from 20/20 hindsight, the evidence clearly indicates that any reasonable law enforcement officer could have taken the same or similar actions pursuant to the analysis outlined in the United States Supreme Court Decision on *Graham v Connor*.

## San Antonio Police Department

56. There has been no evidence produced that indicates that the San Antonio Police Department sanctioned an unspoken custom, practice, and/or policy or procedure of illegal searches, illegal seizures, excessive force, and/or violating citizens rights. The allegation is

unsupported with any kind of material evidence.  Furthermore, the evidence that has been produced is in direct contradiction to the Plaintiff's allegation.  My review of General Manual Procedure 502- Warrantless Arrests, Searches, and Searches, General Manual Procedure 501- Use of Force, and General Manual Procedure 303- Disciplinary Procedures revealed that said procedures are reasonable and within the parameters of proper law enforcement protocol.  The aforementioned procedures are designed to be protective of citizens' rights.

57. The Plaintiff's allegation that Officer Bierman was inadequately trained is diametrically opposite from what the evidence reveals.  The evidence does indicate that on May 8, 2007, Officer Bierman was and continues to be a properly trained law enforcement officer and more specifically adequately and properly trained in the Texas Penal Code, Texas Code of Criminal Procedure, the Use of Deadly Force, the United States Constitution as it relates to the 4th Amendment, and the United States Supreme Court Decision in *Graham v Connor*.

58. The Texas Commission on Law Enforcement Officer Standards and Education is the only entity in Texas that has legislative authority to license police officers and law enforcement academies.  The undisputable evidence indicates that on the day in question, Officer Bierman was and continues to be licensed by the Texas Commission on Law Enforcement Officers Standards and Education as a Texas Peace Officer.  Officer Bierman received his Texas Commission on Law Enforcement Officer Standards and Education Peace Officer License on April 28, 1995.  By June 2, 2004, Officer Bierman had earned every training certification that the Texas Commission on Law Enforcement Officer Standards and Education offers to police officers, Basic, Intermediate, Advanced, Instructor, and Master Certifications.  Officer Bierman also had successfully completed the most advanced Use of Force and Arrest, Search, and Seizure training that the Commission on State Training Standards has to offer, Intermediate Use of Force and Arrest, Search, and Seizure curriculums.

59. The evidence unequivocally indicates that Officer Bierman not only met the State Training Standards for initial licensure but exceeded them in both initial licensure and continuing education.  At the time of the incident, Officer Bierman had successfully attended and completed over 4,000 hours of law enforcement training.

60. The evidence indicates that the San Antonio Police Department provided Officer Bierman with extensive law enforcement training.  There should be no question as to the adequacy of training in connection with Officer Bierman in that he not only met the State

Training Standards in all areas but also exceeded the State Training Standards.

61. The Texas Commission on Law Enforcement Officer Standards and Education establishes the mandated State Training Standards and curricula for Texas Peace Officers. Each Texas Peace Officer Candidate must successfully complete a legislatively mandated course of study. The course of study consists of a variety of law enforcement topic areas to include but not limited to:

1. Patrol Procedures
2. Criminal Investigations
3. Texas Penal Code
4. Texas Code of Criminal Procedure
5. Family Law
6. Arrest, Search, and Seizure
7. First Aid
8. Driving Procedures
9. Use of Force
10. Firearms
11. Physical Fitness
12. Arrest and Control Strategies
13. Cultural Diversity
14. U.S. and Texas Constitution
15. Civil Process and Seizure
16. Traffic Law
17. Juvenile Issues
18. Professional Police Approaches
19. Emergency Communication
20. Crowd Management
21. History of Policing
22. Professionalism and Ethics
23. Stress Management for Police Officers
24. Problem Solving and Critical Thinking
25. Interpersonal Communication/Report Writing
26. Recognizing and Interaction with Persons with Mental Illness and Mental Retardation

62. Upon completion of the aforementioned course of study, police officer candidates must successfully pass a law enforcement officer licensing examination before being commissioned as law enforcement officers. The Texas Commission on Law Enforcement Officer Standards and Education administers the licensing examination. The evidence indicates that Officer Bierman had successfully passed the State Licensing Examination and was issued his Texas Peace Officer License by the Texas Commission on Law Enforcement Officer Standards and Education. In my over 31 years of law enforcement experience, there

has never been an issue and/or allegation regarding the Texas Commission on Law Enforcement Officer Standards and Education State Training Standards being unconstitutional, negligent, unreasonable, inadequate, or illegal.

63. There is no objective evidence to indicate that the San Antonio Police Department violated and/or caused the Plaintiffs' rights to be violated in its training of Officer Bierman. The Plaintiffs' allegation that the San Antonio Police Department did not adequately train Officer Bierman is without merit and unsubstantiated.

64. In conclusion, in viewing the facts through the clear lens of the totality of the circumstances, rather than from a fragmented view of the circumstances, the evidence, without question, indicates that the San Antonio Police Department and Officer Bierman did not violate and/or cause Mark DeLeon's rights to be violated. Officer Bierman's actions were objectively reasonable, discretionary, and within the course and scope of his law enforcement authority. Officer Bierman's actions were consistent with the actions of a reasonable law enforcement officer.

The aforementioned opinions and observations are true and correct to a reasonable degree of professional certainty.

FURTHER AFFIANT SAYETH NOT.

Albert Rodriguez

**SUBSCRIBED AND SWORN TO BEFORE ME**, the undersigned authority, a Notary Public, on this 24th day of June 2009.

Notary Public in and for the State of Texas

Feb 2012
Commission Expires

RONNY ROBERTSON
My Commission Expires
February 23, 2012

# EXHIBIT

# "7"

# ALBERT RODRIGUEZ

*4501 McCormick Mountain Drive*
*Austin, Texas 78734*

*Age:* 55 years
*Wife:* Terry Rodriguez
*Children:* Steven Alberto
*Height:* 6'0"
*Weight:* 210 lbs.

## E D U C A T I O N

**Emergency Medical Technician;** 13 Semester Hours; 1991; Austin Community College, Austin, Texas
**Graduate Credit in Criminal Justice;** 16 Semester Hours; 1986; University of Virginia, Quantico, Virginia
**B.S. in Education;** May 1975; Texas A&I University, Kingsville, Texas
**High School Diploma;** 1971; Falfurrias High School, Falfurrias, Texas

## P R O F E S S I O N A L   E X P E R I E N C E

**1993 to present** — **Commander, Director of Training, Texas Department of Public Safety** - Supervise one captain, three lieutenants, seven sergeants, 35 non-commissioned employees, and all training activities at the Texas Department of Public Safety Training Academy. Instruct in a variety of courses at several TCLEOSE accredited academies throughout the State of Texas.

**1985 to present** — **Law Enforcement Consultant**

**1982 to 1993** — **Staff Lieutenant - Texas Department of Public Safety** - Supervise two staff sergeants and two civilian employees; coordinate Recruit Schools (last Recruit School was March 31 to August 31, 1990); and coordinate In-Service Schools for Traffic Law Enforcement and Criminal Law Enforcement Divisions. Range Master: Instruct firearms courses, oversee all Department firearms issues, repair firearms, develop shooting courses, etc. Instructor in a variety of courses including Use of Force, General Patrol Procedures, Arrest Procedures, Subject Control Tactics, Gun-smithing, etc.

**1981 to 1982** — **Training Officer - Texas Department of Public Safety Academy** - Physical Training, Officer Survival and Subject Control Tactics, Patrol Procedures, Use of Force, Arrest Procedures, etc.

**1977 to 1981** — **Texas Highway Patrol - Pearsall, Pleasanton, and Austin, Texas.**

**1975 to 1977** — **Coach and Teacher - San Antonio Independent School District - Thomas Jefferson High School.**

**1974** — **Neighborhood Youth Counselor -** Counselor for high school students (May to July).

## S P E C I A L I Z E D   T R A I N I N G

- Americans for Effective Law Enforcement; Police Civil Liability, September 1996, Las Vegas, Nevada
- State and Provincial Police Academy Director's Conference; June 1995; Williamsburg, Virginia
- Public Agency Training Council - Use of Force/High Speed Police Pursuit; June, 1995; San Antonio, Texas
- American Society of Law Enforcement Trainers; January 1995; Anchorage, Alaska
- Attorney General's Criminal Law Enforcement Conference; 1995; Austin, Texas
- Southwestern Texas State University Leadership Development Conference; August - September, 1994; Austin, Texas
- U.S. Department of Justice Municipal/Civil Liability Conference; June 1994; Laredo, Texas
- Professional Development Conference; 1994; Texas Department of Public Safety; Austin, Texas
- Attorney General's Criminal Law Enforcement Conference; 1994; Austin, Texas

# SPECIALIZED TRAINING (Continued)

- American Society of Law Enforcement Trainers; January 1993; Washington, D.C
- Police Civil Liability; 1993; Las Vegas, Nevada
- Accidents Involving Petroleum Gas Division; September 6, 1991; Austin, Texas
- Use of Force Symposium; June 23 - 27, 1991; Federal Law Enforcement Training Center; Glynco, Georgia
- Emergency Medical Technician; June 14, 1991; Austin, Texas
- Tactical Baton Instructor; May 21 - 22, 1991; Austin, Texas
- Smith and Wesson Revolver Armorers' Course, April 1991, Lubbock, Texas
- Pistol Smithing Course, Semi-automatic; April 17 - 18, 1991; Austin, Texas
- Spanish for Law Enforcement Instructor Training; March 19 - 23, 1990; Austin, Texas
- Japanese Karate; 1989 to 1990; Austin, Texas
- Texas Department of Public Safety Firearms Instructors' Course, November, 1985
- Manager of Managers Program; April 16 - 20, 1989; New Braunfels, Texas
- High Performance Management; February 28, 1989; Austin, Texas
- American Society of Law Enforcement Trainer's Workshop; January 3 - 7, 1988; New Orleans, Louisiana
- United States Secret Service Dignitary Protection School; January, 1987
- Federal Bureau of Investigation, National Academy; October 1986 - December 1986; 147th Session; Quantico, Virginia
- Deadly Force and the Peace Officer; September, 1986; Northwestern University, Evanston, Illinois
- State Police and Highway Patrol Training Director's Seminar; March 25 - 29, 1985; Jacksonville, Florida
- Confrontation and Stress Management; April 20, 1984; Texas A&M University; College Station, Texas
- Police Defensive Tactics; March 11, 1984; Smith & Wesson Academy; Springfield, Massachusetts
- First Level Management Training; December 1, 1983; Governor's Council, State of Texas; Austin, Texas
- International Non-Lethal Weapons Association Academy; September 19, 1983; Instructor's Certificate Number 0606
- Advanced Officer Survival Seminar; August 10, 1983; Police Marksman Association: New Orleans, Louisiana
- Officer Tear Gas Training; July 26, 1983; Federal Laboratories, Inc.; Austin, Texas
- Federal Laboratories Tear Gas Seminar; July 1983; Austin, Texas
- Licensed, Emergency Medical Technician; February 11, 1983; Health Resource Center; San Marcos, Texas
- Police Instructors' Baton Training; January 17 to 21, 1983; Texas Department of Public Safety; Austin, Texas
- Advanced Accident Investigation Course; October 25 - November 12, 1982; Texas A&M University; College Station, Texas
- Psycho-Motor Skill Design - Instructor Training Seminar; October 3 - 9, 1982; Justice System Association; Chicago, Illinois
- Street Survival Seminar; September 7 - 8, 1982; North Texas Police Chiefs Association; Arlington, Texas
- FBI Instructors' Course; August 30 - September 3, 1982; Federal Bureau of Investigation (FBI); Austin, Texas
- Advanced Instructors' Course; May 10 - 14, 1982; Texas Police Association; Austin, Texas
- Police Physical Fitness Trainers' Course - Certificate of Proficiency; March 13, 1982; Des Moines, Iowa
- Police Fitness Instructors' School; March 8 - 12, 1982; The Institute for Aerobic Research
- Police Photography School; January 5 - 7, 1982; Texas Department of Public Safety; Austin, Texas
- Physical Fitness Program; November 9 - 13, 1981; International Association of Chiefs of Police; Dallas, Texas
- Arts of Self Defense School; October 5 - 12, 1981; Robinette Academy of Personal Protection; Austin, Texas
- Techniques of Group Instruction School; August 31 to September 4, 1981; Texas Department of Public Safety; Austin, Texas
- Officer Survival School; July 1981; Houston Police Department; Austin, Texas
- Breathalyzer Operator Course; November , 1977; Texas Department of Public Safety, Training Academy; San Antonio, Texas
- Texas Department of Public Safety Training Academy, 1,100 hours; 1977; Austin, Texas
- Americans For Effective Law Enforcement, Police Civil Liability, September 1997, Las Vegas, Nevada
- Highway Patrol In-Service Training 1978, 1980, 1982, 1984, 1986, 1988, 1990, 1992, 1994, 1996, 1998, 2000
- Investigation of Homicides and Violent Crimes, July 2000, Department of Public Safety Training Academy
- Defensive Tactics School/Takedowns, August 2000, Las Vegas, Nevada
- TCLEOSE's Academy Coordinators' Workshop, September 2000, Corpus Christi, Texas
- Gang Seminar, (Kim Ogg), November 2000, Texas Department of Public Safety Training Academy, Austin, Texas
- Lewis Grigg's Cultural Diversity Program, June 2000, Texas Department of Public Safety Training Academy; Austin, Texas

## SPECIALIZED TRAINING (Continued)

- Mastering Performance Leadership, May 2000, Texas Department of Public Safety Training Academy, Austin, Texas
- Controlled F.O.R.C.E Instructor Certification Program, August 2000, Las Vegas, Nevada
- National Summit on the Use of Force in Law Enforcement and Corrections, January 2001, Las Vegas Nevada
- Sexual Assault and Homicide Investigation, February 2001, Texas Department of Public Safety Training Academy, Austin Texas
- TCLEOSE's Academy Coordinators' Workshop, September 2001, Corpus Christi, Texas
- Highway Patrol In-Service, April 2002, Texas Department of Public Safety Training Academy
- ASLET International Conference, February 2002, Anchorage, Alaska
- Homicide Investigation-Custody Deaths-Excited Delirium/Cocaine Toxicity, DiMiao, Tx. DPS; April 2002
- Blood Analysis/Blood Spatter, Henderson, Tx. DPS, October 2003
- TCLEOSE's Academy Coordinators' Workshop, September 2003, Corpus Christi, Texas
- Reconstruction of Shooting Incidents and the Investigation of Violent Crime Scenes, April 6, 7 & 8, 2006 Cypress, Texas
- Shooting Reconstruction School, May 9-13, 2005, Texas DPS-Ed Huske
- Crisis Intervention, September 2006, Texas DPS, Austin, Texas
- Excited Delirium, November 16-17, 2006, Institute for Prevention of In-Custody Death, Las Vegas, Nevada

## C E R T I F I C A T I O N S

- Texas Commission on Law Enforcement Officer Standards and Education
- Masters' Certificate
- Instructor's Certificate
- Advanced Certificate
- Intermediate Certificate
- Basic Certificate
- The Aerobic Research Center
- Physical Fitness for Police Officers
- Certificate of Proficiency
- Federal Bureau of Investigation Instructor Certification
- Emergency Medical Technician - Certificate No. 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
- American Society of Law Enforcement Trainers - Certification No. 006573
- Cardiopulmonary Resuscitation Certified; May 17 - 18, 1982; American Red Cross; Austin, Texas
- Radar Operator Certification; December 1980; Texas Department of Public Safety; Austin, Texas
- Firearms Instructor, July 1983, Texas Department of Public Safety
- ASP Baton Instructor, 1991, Texas Department of Public Safety and ASP Inc.
- Oleoresin Capsicum Instructor, 1994, Texas Department of Public Safety
- Air Taser, June 1999, Texas Department of Public Safety
- Taser Instructor, October 2006, Taser Incorporated, Austin, Texas

## S U B J E C T S   T A U G H T

- 3,000 plus Civilian Concealed Handgun Instructors, Austin, Texas
- FBI Use of Force Instructor's Course; Quantico, Virginia
- Mexico State Police Training Courses:
- Officer Survival
- Patrol Procedures
- Defensive Tactics
- Collision Reconstruction
- Probable Cause
- Arrest Procedures
- Firearms
- International Non-Lethal Weapons Association Seminar; Clearwater, Florida

## SUBJECTS TAUGHT (Continued)

- **Officer Survival and Defense Tactics Training Officer's Course;** Northwest University Police Institute; Jacksonville, Florida
- **Officer Survival and Defensive Tactics State Police Director's Course;** Northwest University Police Institute; Jacksonville, Florida
- **Survival and Defensive Tactics Course;** Austin, Texas
- **Officer Survival Course;** Medina County; Hondo, Texas
- **Rape Crisis Course;** Austin, Texas
- **Defensive Tactics Course;** Federal Police; Chihuahua City, Chihuahua, Mexico
- **Attorney General's Criminal Law Enforcement Conference - Use of Force;** Austin, Texas
- **Attorney General's Criminal Law Enforcement Conference - Police Pursuits;** Austin, Texas
- **Arkansas Narcotics Officers Association,** August 1996, Little Rock, Arkansas
- **Oklahoma Narcotics Officers Association,** October 1996, Oklahoma City, Oklahoma
- **United States Attorney's Law Enforcement Coordinating Conference,** May 1997, Corpus Christi, Texas
- **Texas Defensive Tactic's Instructors' Association,** August 1997, Austin, Texas
- **Agencies throughout the State of Texas:**
- Patrol Procedures
- Use of Force
- Use of Deadly Force
- Use of Force in Jail Settings
- Firearms
- Police Emergency Driving
- Police Pursuit Driving
- Probable Cause
- Arrest, Search and Seizure
- Arrest Procedures
- Texas Criminal Laws
- Texas Traffic Laws
- **Use of Force Investigations,** Internal Affairs Units and Texas Rangers (April 2002)
- **Police Pursuits and Emergency Response,** Texas Sheriff Association, Lubbock, Texas
- **Investigation of Police Officer Involved Shootings,** Texas Department of Public Safety
- **Investigation of Police Officer Involved Shootings,** Vancouver, Canada
- **Investigation of Police Officer Involved Shootings,** Sacramento, California

## MEMBERSHIPS AND ASSOCIATIONS

- Texas Police Association
- Texas Sheriff's Association
- Department of Public Safety Association
- FBI National Academy Graduates Associates
- American Society of Law Enforcement Trainer's Association
- Police Marksman Association
- 1480 Shooter's Club
- Governor's "top twenty"
- Southwest Texas State University Criminal Justice Advisory Board
- Austin Community College Law Enforcement Advisory Board
- Texas Alcohol Beverage Commission Law Enforcement Advisory Board\
- Texas Department of Public Safety Law Enforcement Advisory Board

*ALBERT RODRIGUEZ*
*AUSTIN, TEXAS*

## TESTIFIED BY DEPOSITION AND/OR TRIAL

Gabriel Goffney, Lois Goffney vs. Thomas James Carr, Gary Gene Parker, David Wayne Hennessy, Tommy Eugene Kiser, Victor J. Zigmont, Mauro Alvardo, John Louis Morrison, Dennis L. Barker, and Harris County, Texas, Civil Action No. H-00-3083; In the United States District Court Texas for the Southern District, Houston Division

Christina B. Haggard vs. Deputy Constable Linnard Crouch; Civil Action No. H-99-1076; Deposition

The State of Texas v. Patrick Bradford; Palo Pinto District Court; Trial; May 2004; Trial

Civil Action No. 2003-CVQ-00995-P3; Maria Azucena Arredondo Olmos, Individually and as Representative of the Estate of Jesus Barrera Vasquez, and as next friend of Fernando Jose Vasquez Arredondo, and Laura Yoana Vasquez Arredondo, minors; Pablo Vasquez Ramirez and Maria Dolores Barrera de Vasquez vs. Juan Garza Mendoza, Hurd Ranch Company, LTD., John R. Hurd and Hurdco, Inc., County District Court; Deposition and trial.

Jeanette Goodman, Individually and as Administratrix of Michael Goodman v. Harris County, et. al; Cause No. H-03-4198; In the United States District Court for the Southern District, Houston Division

Sean Carlos Ibarra, et. al. vs. Harris County, et. al.; Civil Action No. H-04-0186; In the United States District Court for the Southern District of Texas, Houston Division; Testimony by Deposition

Diane Alpha, Clayton Lynn Anderson, Tommy D. Anderson, and Rebecca Mull vs. Matt Hooper and Sheriff Charles "Butch Adams and Hopkins County, Texas; Civil Action No. 5-03CV002; In the United States District Court for the Eastern District of Texas, Texarkana Division

The State of Washington vs David R. Gallegos, Bellingham, Washington, District Court, Trial Testimony

The State of Texas vs. Daniel Miller, Dallas, Texas, District Court; Trial Testimony

Emilio Sanchez, Sr. et. al. vs. Michael Vennel, Cause No. 2-06CV-047-J; In the United States District Court for the Northern District of Texas, Amarillo Division; Deposition Testimony

Regina Kelly, et. al. vs. City of Wake Village; Cause No. 504-CV-137; In the United States District Court for the Eastern District of Texas; Texarkana Division; Deposition Testimony

Monica Diaz, Antonia Balderas, Andelario Balderas and Michael Balderas Junior and as Next Friend of Michael Balderas vs City of San Antonio and Scott Poth; Civil Action No. SA-05-CA-0888-RF; In the United States District Court for the Western District of Texas, San Antonio Division

Eli Eloy Escobar and Lydia Escobar, individually and as Heirs of and Representatives of the Estate of Eli Eloy Escobar, Jr., v The City of Houston and Arthur J. Carbonneau; Civil Action No. H-04-1945; In the United States District Court for the Southern District, Houston Division

Linda Sanders-Burns, individually and as an heir of the Estate of Anthony Demille Sanders, Deceased vs City of Plano, and Police Officer Joe Cabezuela; Civil Action No. 2-06CV-439-TJW; In the United States District Court for the Eastern Division, Sherman Division

Daniel Rocha, Deceased, By Daniela Rocha, Mother and Representative of Estate and Gerardo Rocha, Father v City of Austin, Julie Schroeder and Don Douglas Doyle, In their Official and Individual Capacities; Civil Action No. A-06-CA-067-LY; In the United States District Court for Western District, Austin Division

Diane and David Hopgood, individually and Vanessa Hopgood as independent administrator of the estate of Alexander Herold Hopgood and Staci Bovill vs The City of Austin, Edward L. Johnson, Sr. and Yvonne Gunnlaugsson; Civil Action No. A-06-CA-306-LY; In the United States District Court for the Western District, Austin Division

Rodney Kibble, on behalf of himself and all others similarly situated v Tommy Thomas, in His Official Capacity and as Sheriff of Harris County, Texas, Harris County, Texas and Todd Colson; Civil Action No. H-05-3376; In the United States District Court for the Southern District, Houston Division

Roberta Lynn Martin vs City of San Antonio Police Department, Officer Norma Woods, L. Carrion, J. Willingham, and E. Rodriguez in their individual capacities; Cause No. SA-05-CA-0020-XR; In the United States District Court for the Western District, San Antonio Division

State of Texas vs. Juan Garza Mendoza; Webb Count District Court

Amanda Ramirez, as next of Friend of Viktoria M. Ramirez, Alejandria Ramirez, and Jose L. Ramirez, Jr., Minor Children, Christina Perez, as next of Friend of Marisa Diaz, a Minor and Angela Diaz, as next Friend of Alicia Anzaldua, a Minor; Cause No. 218-183-B; In the District Court 144th District Court, Bell County, Texas

Armando Jamies, et. al. vs. Greeg County, Texas, et. al.; Civil Action No. 2:07-CV-122TJW; In the United States District Court Eastern District of Texas, Marshall Division

Linda Freeman v Jason Gore, Jeff Bragg, and Brain Allison; Civil Action No. 6-04-CV-5267; In United States District Court for the Eastern District, Tyler Division

Ramon Perez vs. City of Austin, et. al.; Cause No. A-07-CA-044LY; In the United States District Court for the Western District, Austin Division

Anthony Rios v City of San Antonio, Texas, et. al.; Civil Action No. SA-05-CA-0884; In the United States District Court for the Western District of Texas, San Antonio, Division

(updated 6-28-08)